**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

———————————————————————x
                                          :
BRAD BARKAU, Individually and on          :
Behalf of All Others Similarly Situated,  :
                                          :
                          Plaintiff,      :
                                          :    No. 16-cv-02971 (RA)
              v.                          :
                                          :
CALIFORNIA RESOURCES                      :
CORPORATION,                              :
                                          :
                          Defendant.      :
                                          :
———————————————————————x


**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT**
**CALIFORNIA RESOURCES CORPORATION'S MOTION PURSUANT TO**
**FED. R. CIV. P. 12(b)(1) & 12(b)(6) TO DISMISS THE CLASS ACTION COMPLAINT**

Theodore Edelman
Darrell S. Cafasso
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004-2498
Telephone: (212) 558-4000
Facsimile: (212) 558-3588

*Counsel for Defendant California*
*Resources Corporation*

July 8, 2016

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................ 1

BACKGROUND ................................................................................................... 6

    A.   The 2014 Notes ................................................................................ 6

    B.   Pre-Exchange Offer Downgrades of CRC and the 2014 Notes ............................ 8

    C.   The Exchange Offer ................................................................................ 8

    D.   Post-Exchange Offer Performance of the 2014 Notes ........................................... 9

ARGUMENT ....................................................................................................... 11

I.     PLAINTIFF LACKS ARTICLE III STANDING. ........................................................ 11

    A.   Article III Standing Requires An Injury-in-Fact. ................................................. 11

    B.   Plaintiff Fails To Allege an Injury-in-Fact. ....................................................... 11

II.    THE COMPLAINT FAILS TO ALLEGE AN "IMPAIRMENT" NECESSARY TO STATE A CLAIM FOR VIOLATION OF TIA § 316(b). .......................................... 14

    A.   Plaintiff Has Not Suffered a Legal Impairment. ................................................. 16

    B.   Even if Section 316(b) Applies to "Practical" Impairments, Plaintiff Has Not Suffered Such an Impairment. ............................................................. 18

III.   PLAINTIFF'S STATE LAW CLAIMS ARE LEGALLY DEFECTIVE. ......................... 21

    A.   The Indenture's "No-Action" Clause Bars the State Law Claims. ........................ 21

    B.   The Breach of Contract Claim Merely Replicates the TIA Claim and Fails for the Same Reasons. ...................................................................... 22

    C.   The Claim for Breach of the Duty of Good Faith and Fair Dealing Fails Under the Plain Terms of the Indenture. ............................................... 23

    D.   The Unjust Enrichment Claim Is Duplicative of Plaintiff's Contract Claims. ....... 24

    E.   The Declaratory Relief Claim Merely Repeats the Other Causes of Action. ........ 25

CONCLUSION ................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Almog* v. *Arab Bank, PLC*,
  471 F. Supp. 2d 257 (E.D.N.Y. 2007) ...................................................................23

*Bank of N.Y.* v. *First Millennium, Inc.*,
  607 F.3d 905 (2d Cir. 2010) ..................................................................... *passim*

*BOKF, N.A.* v. *Caesars Entm't Corp.*,
  144 F. Supp. 3d 459 (S.D.N.Y. 2015) ..............................................................4, 20

*Brennan* v. *Nassau Cnty.*,
  352 F.3d 60 (2d Cir. 2003) ................................................................................3, 11

*Broder* v. *Cablevision Sys. Corp.*,
  418 F.3d 187 (2d Cir. 2005) ...............................................................................23

*Chiste* v. *Hotels.com L.P.*,
  756 F. Supp. 2d 382 (S.D.N.Y. 2010) ...............................................................25

*Clapper* v. *Amnesty Intern. USA*,
  133 S. Ct. 1138 (2013) ...........................................................................3, 11, 12

*Corsello* v. *Verizon N.Y., Inc.*,
  967 N.E.2d 1177 (N.Y. 2012) ...........................................................................24

*Ellington Credit Fund, Ltd.* v. *Select Portfolio Servicing, Inc.*,
  837 F. Supp. 2d 162 (S.D.N.Y. 2011) ...............................................................21

*Federated Strategic Income Fund* v. *Mechala Group Jamaica Ltd.*,
  1999 WL 993648 (S.D.N.Y. Nov. 2, 1999) ....................................................18, 20

*Fleisher* v. *Phoenix Life Ins. Co.*,
  858 F. Supp. 2d 290 (S.D.N.Y. 2012) ...............................................................25

*Garber* v. *Legg Mason, Inc.*,
  347 F. App'x 665 (2d Cir. 2009) .........................................................................6

*In re AOL Time Warner Inc. Sec. & ERISA Litig.*,
  381 F. Supp. 2d 192 (S.D.N.Y. 2004) ...............................................................14

*In re Bd. of Dirs. of Multicanal S.A.*,
  307 B.R. 384 (Bankr. S.D.N.Y. 2004) .....................................................15, 17, 20

*In re Crude Oil Comm. Futures Litig.*,
  913 F. Supp. 2d 41 (S.D.N.Y. 2012), (iv) ........................................................6, 10

*In re Loral Space & Commc'ns Inc.*,
  2008 WL 4293781 (Del. Ch. Sept. 19, 2008) ........................................................24

*In re Northwestern Corp.*,
  313 B.R. 595 (Bankr. D. Del. 2004) ...........................................4, 15, 16, 17

*Kramer* v. *Time Warner Inc.*,
  937 F.2d 767 (2d Cir. 1991).......................................................................6

*Lujan* v. *Defenders of Wildlife*,
  504 U.S. 555 (1992).................................................................................11

*Marblegate Asset Mgmt.* v. *Educ. Mgmt. Corp.*,
  75 F. Supp. 3d 592 (S.D.N.Y. 2014) (hereafter, *"Marblegate I"*) ................4, 19, 20

*McMahan & Co.* v. *Wherehouse Entm't, Inc.*,
  859 F. Supp. 743 (S.D.N.Y. 1994), *aff'd and rev'd in part*, 65 F.3d 1044 (2d Cir. 1995)......17

*MeehanCombs Global Credit Opportunities Funds, LP* v. *Caesars Entm't Corp.*,
  80 F. Supp. 3d 507 (S.D.N.Y. 2015)...............................................4, 19, 20, 23

*Port Washington Teachers' Ass'n* v. *Bd. of Educ. of Port Washington Un. Free Sch. Dist.*,
  478 F.3d 494 (2d Cir. 2007)......................................................................11

*Quadrant Structured Prods. Co., Ltd.* v. *Vertin*,
  23 N.Y.3d 549 (2014).............................................................................21

*Rajamin* v. *Deutsche Bank Nat'l Trust Co.*,
  757 F.3d 79 (2d Cir. 2014)......................................................................12

*Ret. Bd. of the Policemen's Ann. and Ben. Fund of Chicago* v. *Bank of New York Mellon*,
  914 F. Supp. 2d 422 (S.D.N.Y. 2012).........................................................16

*RJ Capital* v. *Lexington Capital Funding*,
  2011 WL 3251554 (S.D.N.Y. July 28, 2011) ...............................................23

*Rothman* v. *Gregor*,
  220 F.3d 81 (2d Cir. 2000), (iii).................................................................6

*Scanlan* v. *Kodak Ret. Income Plan*,
  678 F. Supp. 2d 110 (W.D.N.Y. 2010) ...............................................12, 13

*Schallitz* v. *Starrett Corp.*,
  82 N.Y.S.2d 89 (Sup. Ct. N.Y. Cnty. 1948) ...............................................17

*Spokeo, Inc.* v. *Robins*,
  136 S. Ct. 1540 (2016)............................................................................11

*UPIC & Co.* v. *Kinder-Care Learning Ctrs., Inc.*,
   793 F. Supp. 448 (S.D.N.Y. 1992) ....................................................................17

*YRC Worldwide Inc.* v. *Deutsche Bank Trust Co. Americas*,
   2010 WL 2680336 (D. Kan. July 1, 2010) .................................................4, 16, 17

STATUTES

15 U.S.C. §§ 77aaa ...........................................................................................................15

28 U.S.C. § 2201 .................................................................................................................3

15 U.S.C. § 77ppp(b) (Trust Indenture Act § 316(b)) ........................................... *passim*

15 U.S.C. § 77rrr(c) ...........................................................................................................23

OTHER AUTHORITIES

American Bar Foundation, *Commentaries on Indentures* 8 (1971)...................................9

Ben H. Logan, *The Trust Indenture Act, Debt Restructuring and Reorganization Tourism*,
   36 Bankr. L. Ltr. No. 3, at 1 (March 2016) ...................................................................5

Harald Halbhuber, *Debt Restructurings and the Trust Indenture Act*, Harv. L. Forum on Corp.
   Governance and Fin. Reg. (June 14, 2016) ...................................................................5

Nicole Friedman, *U.S. Oil Prices Settle at 2016 High*, THE WALL STREET JOURNAL (May
   16, 2016) ......................................................................................................................10

Stanley Reed, *Oil Prices Slump to 11-year Lows in Asia and Europe*, N.Y. TIMES (Dec.
   21, 2015) ........................................................................................................................9

Defendant California Resources Corporation ("CRC" or the "Company") respectfully submits this memorandum of law in support of its motion, pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure, to dismiss for lack of standing and failure to state a claim the putative class action complaint (the "Complaint" or "Compl.") filed in this action on April 21, 2016 by Brad Barkau ("Plaintiff").

## PRELIMINARY STATEMENT

The Complaint asserts a series of duplicative and legally deficient claims under Section 316(b) of the Trust Indenture Act of 1939, 15 U.S.C. § 77aaa, *et seq*. ("TIA"), and state law, that challenge CRC's consummation of a debt exchange offer in 2015. Plaintiff alleges that CRC issued to others secured notes that are effectively senior to unsecured notes previously issued to him and the putative class in 2014 and thereby impaired their rights to repayment of principal and interest on the unsecured notes. Plaintiff does not, and cannot, allege that CRC has actually failed to pay any principal and interest payments owed under his notes. Nor does he allege that CRC transferred assets, eliminated guarantees or amended any term of the October 2014 indenture (the "Indenture") governing those notes. In fact, the Indenture expressly permitted CRC to incur additional debt, including secured debt, and nothing in the Indenture granted holders a right to participate in any future debt offering. Ignoring the Indenture's provisions altogether, Plaintiff now tries to manufacture claims based on the hypothetical injury that could arise if CRC becomes unable to make payments due on his notes in the future. Thus, Plaintiff fails to allege not only a legally cognizable harm, but even a sufficient injury-in-fact necessary to confer standing to bring this action. On these facts, it would be unprecedented, and highly disruptive to the capital markets, for the Court to find that the TIA confers new substantive rights on noteholders in contravention of the Indenture's express terms.

CRC, a publicly traded oil and natural gas exploration and production firm, issued

several series of unsecured notes in October 2014 (the "2014 Notes"). (Compl. ¶ 16.) Plaintiff

purportedly holds certain of the 2014 Notes. (Compl. ¶ 12.) On or about November 12, 2015, in

the throes of rapidly deteriorating market conditions for the oil and gas industry, CRC

commenced a private exchange offer (the "Exchange Offer") enabling eligible holders of the

2014 Notes to tender them in exchange for new notes (the "2015 Notes") at a significant discount

to the face value of the 2014 Notes. (Compl. ¶¶ 24, 35.) Through the Exchange Offer, which

closed on December 11, 2015, CRC reduced its debt by $563 million. (Compl. ¶¶ 39-40.)

Because CRC conducted the Exchange Offer as a private placement available only to Qualified

Institutional Buyers ("QIBs") and certain non-U.S. persons, as is customary in transactions of

this nature, Plaintiff and other non-QIBs were not eligible to participate. (Compl. ¶ 4.)

       Plaintiff contends that the Exchange Offer represented a "sweet deal" for QIBs

and regrets his ineligibility to take part. (Compl. ¶ 34.) After several months' delay, which the

Complaint does not explain, he filed this action in April 2016 on behalf of a putative class of

holders of the 2014 Notes (excluding QIBs and non-U.S. persons) from November 12, 2015 to

the present. He alleges that "[t]he selective and exclusionary nature of the Exchange Offer was

unfair and discriminatory towards the non-QIB holders of the [2014 Notes]." (Compl. ¶ 7.)

Plaintiff does not, and cannot, allege that CRC changed any term of the 2014 Notes or engaged

in any form of corporate restructuring; nor does or can he allege that he has failed to receive any

payments of principal or interest under the 2014 Notes. Rather, he contends that the Exchange

Offer injured noteholders "by unrightfully subordinating the [2014 Notes] to the [2015 Notes]

created in the Exchange Offer" and by supposedly triggering a ratings downgrade of the 2014

Notes in December 2015. (Compl. ¶¶ 7, 41.) In other words, Plaintiff alleges that the Exchange

Offer injured him and other non-QIB holders because, by issuing secured debt effectively senior

to the 2014 Notes—as expressly allowed by the Indenture—the Exchange Offer increased the risk that CRC would be unable to meet its payment obligations on the 2014 Notes. Based on this hypothetical "injury," he asserts claims for (1) violations of TIA § 316(b), which prohibits certain "impairments" of a noteholder's right to receive principal and interest; (2) breaches of the October 1, 2014 Indenture for the 2014 Notes; (3) breaches of an implied covenant of good faith and fair dealing; (4) unjust enrichment; and (5) a declaration, pursuant to 28 U.S.C. § 2201, that the Exchange Offer "is null and void." (Compl. ¶¶ 59-88.) Each claim fails as a matter of law.

**Plaintiff Lacks Standing**. As a threshold matter, Plaintiff lacks Article III standing. Even accepting Plaintiff's allegation that the Exchange Offer "affected the likelihood of full repayment" on the 2014 Notes "in the event of default" (Compl. ¶ 63), he does not allege, nor could he, that default is imminent. Plaintiff's alleged injury—the increase in default risk on the 2014 Notes resulting from the issuance of secured debt and the December 2015 ratings downgrade of the 2014 Notes—is entirely hypothetical and insufficiently concrete or imminent to meet the injury-in-fact requirement. The Complaint does not allege that CRC altered any term of the 2014 Notes or missed any payments due under them, and the mere risk that CRC might be unable to make those payments in the future is precisely the type of "possible future injury" that the Supreme Court and Second Circuit deem insufficient to confer Article III standing. *See, e.g.*, *Clapper* v. *Amnesty Intern. USA*, 133 S. Ct. 1138, 1147 (2013); *Brennan* v. *Nassau Cnty.*, 352 F.3d 60, 65 n.9 (2d Cir. 2003). A mere supposed increase in default risk, which is the most Plaintiff can allege, is not enough to establish Article III standing. Plaintiff's failure to allege concrete harm is an independently sufficient basis to dismiss the Complaint.

**Plaintiff Fails To State a Viable TIA Claim**. Notwithstanding the absence of any allegation that CRC has defaulted on the 2014 Notes or that default is imminent, and

ignoring that the Indenture permitted CRC to incur additional secured debt, Plaintiff alleges that by issuing the 2015 Notes without his consent, "the Company impaired the value of the [2014 Notes]" and "affected the likelihood of full repayment" in violation of TIA § 316(b). (Compl. ¶ 63.) Section 316(b) does not apply here for two reasons:

*First*, Section 316(b) protects against actions that impair or affect a holder's legal right to receive payment of principal and interest when due; it does not apply to actions that might make it potentially more difficult for holders to obtain such payment in the future. As several courts have held, "Section 316(b) does not provide a guarantee against the issuing company's default." *YRC Worldwide Inc.* v. *Deutsche Bank Trust Co. Americas*, 2010 WL 2680336, at *7 (D. Kan. July 1, 2010); *In re Northwestern Corp.*, 313 B.R. 595, 600 (Bankr. D. Del. 2004) ("[T]here is no guarantee against default."). Because Plaintiff does not allege that the Exchange Offer impaired his legal rights to receive payment of principal and interest under the 2014 Notes, his TIA claim must be dismissed.

*Second*, even if the TIA were construed to prohibit certain debt restructurings that leave holders with no practical ability to obtain payments due under the notes—a reading recently adopted by two judges of this Court and currently on appeal to the Second Circuit in circumstances vastly different from those presented here—Plaintiff's claim still fails because the Exchange Offer did not have that effect.[1] Again, Plaintiff does not allege that he has failed to receive principal and interest payments owed under his notes, nor does he allege that default is imminent or certain on his notes. Plaintiff is trying to stretch the holdings of *Marblegate* and

---

[1]    *See Marblegate Asset Mgmt.* v. *Educ. Mgmt. Corp.*, 75 F. Supp. 3d 592 (S.D.N.Y. 2014) (hereafter, "*Marblegate I*"); 111 F. Supp. 3d 542 (S.D.N.Y. 2015), *appeal argued*, No. 15-2124 (2d Cir. May 12, 2016); *MeehanCombs Global Credit Opportunities Funds, LP* v. *Caesars Entm't Corp.*, 80 F. Supp. 3d 507 (S.D.N.Y. 2015); *BOKF, N.A.* v. *Caesars Entm't Corp.*, 144 F. Supp. 3d 459 (S.D.N.Y. 2015).

*Caesars Entertainment* (*see infra* at 18-20), in which the courts, elevating substance over form, concluded that Section 316(b) applies to debt reorganizations that, while leaving noteholders with an unaltered formal right to payment, effectively negate noteholders' ability to obtain payment by eliminating guarantees on the notes and transferring assets from the debtors. The Exchange Offer, in which CRC exercised its disclosed right to incur new indebtedness and thereby achieved a substantial debt reduction, did not involve any such conduct and is worlds apart from the debt reorganizations at issue in those cases, which left noteholders with worthless claims against insolvent entities. Regardless of whether Section 316(b) applies to the facts in those cases, no court has applied it to routine corporate transactions like the Exchange Offer that involve the mere issuance of senior debt expressly permitted by the Indenture. Such a ruling, in addition to being unprecedented, would depart from the plain meaning and history of Section 316(b), with far-reaching consequences for the bond markets.[2]

**Plaintiff's State Law Claims Are Legally Defective**. Plaintiff's state law claims fail for two reasons. *First*, they are barred at the gate by the "no-action" clause in Section 6.06 of the Indenture, which vests authority to sue on the 2014 Notes only in the indenture trustee, not individual noteholders, except in narrowly defined circumstances inapplicable here. New York courts routinely enforce such clauses in circumstances that are indistinguishable from this case.

*Second*, Plaintiff's state law claims are legally defective under New York law:

- Plaintiff's breach of contract claim (Count Two) duplicates his TIA claim—the allegedly breached Indenture provision mimics Section 316(b) and thus fails for the same reasons that the TIA claim fails.

---

[2] *See* Ben H. Logan, *The Trust Indenture Act, Debt Restructuring and Reorganization Tourism*, 36 Bankr. L. Ltr. No. 3, at 1 (March 2016); *see also* Harald Halbhuber, *Debt Restructurings and the Trust Indenture Act*, Harv. L. Forum on Corp. Governance and Fin. Reg. (June 14, 2016), *available at* https://corpgov.law.harvard.edu/ 2016/06/14/debt-restructurings-and-the-trust-indenture-act/#more-73076.

- Plaintiff's implied covenant of good faith and fair dealing claim (Count Three) is barred by the plain terms of the Indenture. The implied covenant is a "gap filling default rule" applicable only when a question is not resolved by the terms of the contract; it cannot create obligations that are inconsistent with the contract.

- Plaintiff's unjust enrichment claim (Count Four) and declaratory relief claim (Count Five) merely duplicate the deficient TIA and contract claims. Plaintiff fails to plead how the aggregate reduction in debt as a result of the Exchange Offer unjustly enriched the Company or resulted in the taking of any benefit belonging to holders.

*    *    *

In short, Plaintiff may prefer to hold 2015 Notes rather than 2014 Notes, but the TIA does not give noteholders a right to participate in alternative debt transactions, nor does it prohibit the issuance of additional secured debt. Nothing in the TIA overrides the plain terms of the Indenture, which permitted CRC to incur additional secured debt that would be effectively senior to Plaintiff's unsecured notes. The Complaint should be dismissed in full with prejudice.

## BACKGROUND

### A. The 2014 Notes

CRC originally issued the 2014 Notes on October 1, 2014 in private transactions that, like the Exchange Offer, were open to QIBs and non-U.S. persons only.[3] (Compl. ¶ 16.) The 2014 Notes were issued pursuant to, and are governed by, the Indenture. (Compl. ¶ 4; Ex. A.)[4] On March 12, 2015, the Company filed a registration statement on Form S-4 (the

---

[3]   The 2014 Notes include seven series of senior unsecured notes: (i) three series of 5% notes due in 2020; (ii) one series of 5½% notes due in 2021; and (iii) three series of 6% notes due in 2024. (Compl. ¶¶ 1, 16.)

[4]   All references to "Ex." refer to exhibits to the Declaration of Darrell S. Cafasso, dated July 8, 2016. The Court may consider these exhibits on this motion because they are (i) "statements or documents incorporated into the complaint," (ii) "documents that the plaintiff[] either possessed or knew about and upon which [he] relied in bringing the suit," *Rothman* v. *Gregor*, 220 F.3d 81, 88 (2d Cir. 2000), (iii) financial markets data of which the Court may take judicial notice, *see In re Crude Oil Comm. Futures Litig.*, 913 F. Supp. 2d 41, 52 (S.D.N.Y. 2012), (iv) "press coverage" introduced for the fact that coverage "contained certain information, without regard to the truth of [its] contents," *Garber* v. *Legg Mason, Inc.*, 347 F. App'x 665, 669 (2d Cir. 2009), or (v) other documents of which the Court may take notice, *see Kramer* v. *Time Warner Inc.*, 937 F.2d 767, 773-74 (2d Cir. 1991).

"Prospectus") with the SEC for an offer to exchange the notes that had not been registered under the Securities Act of 1933 with identical registered notes. (Ex. B.) The Company completed that exchange in April 2015. (Compl. ¶¶ 16, 17.) The 2014 Notes "are fully and unconditionally guaranteed on a senior unsecured basis by all of the Company's material subsidiaries." (Compl. ¶ 16.) Plaintiff alleges that he owns an unspecified number of the 6% notes, but does not allege when or how he acquired them. (Compl. ¶ 12.) Notably, he does not allege that CRC has failed to make any payments due on the 2014 Notes or modified or transferred any of the guarantees by the Company's material subsidiaries.

Nothing in the Indenture or the Prospectus forbids CRC from incurring additional senior debt. To the contrary, both the Indenture and Prospectus disclosed and cautioned that the 2014 Notes were unsecured, that CRC could issue significant additional debt, including secured debt, and that the 2014 Notes effectively would be junior to any future secured debt. In addition, no provision of the Indenture gave holders of the 2014 Notes the right to participate in any future purchases of those notes or in any issuances of other securities.

- The Indenture provides that CRC could incur future secured indebtedness: "[T]he Company or any restricted Subsidiary may create, incur or assume Funded Debt secured by liens . . . if the aggregated principal amount of such Funded Debt . . . does not exceed 15% of the Adjusted Consolidated Net Tangible Assets of the Company." (Indenture § 4.07.)

- The Prospectus correspondingly states that: "The indenture under which the [2014 Notes] were issued permits us to incur significant secured obligations without equally and ratably securing the exchange notes." (Prospectus at 20 (emphasis added).)

- The Prospectus also states that the 2014 Notes "are unsecured and therefore will be effectively junior in right of payment to any of our future secured debt." (*Id.*)

- The Prospectus further states that "[i]n the event of a bankruptcy or similar proceeding, the assets that serve as collateral for any secured debt will be available to satisfy the obligations under the secured debt before any payments are made on the exchange notes." (*Id.*)

**B.      Pre-Exchange Offer Downgrades of CRC and the 2014 Notes**

CRC's issuance of the 2014 Notes preceded a historic decline in oil and gas

prices.  On October 1, 2014, the date the Company issued the 2014 Notes, the NYMEX futures

contract for crude oil closed at $90.73 per barrel.  A year later, on October 1, 2015, the same

contract closed at $44.74, a drop of more than 50% percent.  (Ex. C.)  Not surprisingly, in the

midst of this decline, Moody's downgraded the Company's credit ratings.  On March 23, 2015,

Moody's downgraded CRC's Corporate Family Rating ("CFR") and the 2014 Notes from Ba1 to

Ba2.  Moody's stated that "[t]he dramatic drop in oil prices in light of the high leverage has

weakened CRC's risk profile to the point that a Ba2 rating is more appropriate."  (Compl. ¶ 18.)

As oil prices continued to decline over the course of 2015, on September 16, 2015, Moody's

further downgraded the Company's CFR from Ba2 to B1 and the 2014 Notes from Ba2 to B2.

Moody's again cited "weak commodity prices" as the basis for the downgrades.  (Compl. ¶ 20.)[5]

**C.      The Exchange Offer**

CRC announced the Exchange Offer on November 12, 2015.  (Compl. ¶ 23.)[6]

The Exchange Offer allowed eligible holders of the 2014 Notes to exchange their existing bonds

for 2015 Notes that bear an 8% interest rate, mature in 2022, and are secured by a

second-priority lien on the Company's property and assets.  (Compl. ¶¶ 26, 28.)  In return,

---

[5]      S&P's ratings of CRC and the 2014 Notes similarly tracked downward in light of falling oil prices, and S&P made clear that the Exchange Offer was not driving those ratings.  (S&P Global Ratings (Nov. 12, 2015), Ex. D (affirming its prior rating of the 2014 Notes following CRC's "announcement that it has launched an exchange offer"); S&P Global Ratings (Jan. 14, 2016), Ex. E. ("outlook reflects our assessment of the continued weak crude oil prices and the potential for [CRC's] liquidity to deteriorate").)

[6]      CRC was not alone.  Several other oil and gas firms conducted debt exchanges in 2015 and 2016.  (*See, e.g.*, Goodrich Petroleum Corp. Form 8-K (Oct. 7, 2015), Ex. F; Chesapeake Energy Co. Form 8-K (Dec. 23, 2015), Ex. G; Vanguard Natural Resources, LLC Form 8-K (Feb. 17, 2016), Ex. H; Cliffs Natural Resources Inc. Form 8-K (Mar. 2, 2016), Ex. I.)  Similar TIA actions were filed in this Court against Vanguard, Cliffs Natural Resources and Chesapeake, and two remain pending here.  *Waxman* v. *Cliffs Natural Res. Inc.*, No. 16-cv-01899-RWS; *Culp* v. *Vanguard Natural Res., LLC*, 16-cv-02303-PKC; *Cummings* v. *Chesapeake Energy Corp.*, 16-cv-02338 (transferred to W.D. Okla.).

eligible noteholders accepted a 20% discount from the face value of their 2014 Notes. (Compl. ¶¶ 23-24.) The Exchange Offer provided for a tender of up to $1 billion in aggregate principal of 2014 Notes, but the Company subsequently increased the size to $2.8125 billion in aggregate principal (consistent with the Indenture's 15% limit on new indebtedness (*see* Indenture § 4.07)). (Compl. ¶¶ 23, 33.) The Exchange Offer did not involve any change in the terms of the 2014 notes, any change in, or movement of, CRC's assets, elimination of any guaranty or corporate restructuring.

As is a common market practice, the Exchange Offer was an unregistered offering and only QIBs and certain non-U.S. persons were eligible to participate. (Compl. ¶ 2; *see* American Bar Foundation, *Commentaries on Indentures* 8 (1971).) Plaintiff allegedly fell into neither category and thus was ineligible to participate. (Compl. ¶¶ 2, 12.) When the Exchange Offer closed on December 11, 2015, eligible holders had tendered $3.65 billion in aggregate principal of 2014 Notes, but the Company bought back only the $2.8125 billion, leaving many QIBs holding a large portion of the outstanding unsecured notes. (Compl. ¶ 35.) The Exchange Offer resulted in a reduction of CRC's outstanding debt by $563 million (Compl. ¶¶ 22, 39; CRC Release (Dec. 15, 2015), Ex. J), and improved CRC's liquidity by increasing its borrowing limits on its credit facility (*See* CRC Release (Nov. 5, 2015), Ex. K).

D.    **Post-Exchange Offer Performance of the 2014 Notes**

Following the Exchange Offer, adverse economic conditions continued to plague the oil and gas industry. On November 12, 2015, when the Exchange Offer was announced, oil traded at $41.75 per barrel.[7] By December 11, 2015, the date the Exchange Offer closed, oil traded at $35.62 per barrel, a downward trend that would continue into early 2016.

---

[7]    *See* Stanley Reed, *Oil Prices Slump to 11-year Lows in Asia and Europe*, N.Y. TIMES (Dec. 21, 2015), http://www.nytimes.com/2015/12/22/business/energy-environment/oil-prices-opec.html?_r=0.

Consequently, on December 21, 2015, Moody's again downgraded CRC's credit ratings across the board. Moody's downgraded the Company's CFR to Caa1 from B1 and downgraded the 2014 Notes to Caa3 from B2. (Compl. ¶ 40; *see also* Exs. D-E.) Moody's also downgraded CRC's first-lien revolving credit facility and term loan to B1 from Ba1, even though the credit facility and term loan were senior in the credit structure to the 2015 Notes. Moody's stated that the "downgrade of CRC's CFR to Caa1 reflects weak industry conditions with oil and natural gas prices at multi-year lows." (Compl. ¶ 40.)

As shown in Figure 1, oil prices have recovered from lows reached in early 2016 and the 2014 Notes, which tracked those oil market reverberations, have similarly rebounded:[8]



**Figure 1**

---

[8]   *See* Nicole Friedman, *U.S. Oil Prices Settle at 2016 High*, THE WALL STREET JOURNAL (May 16, 2016), http://www.wsj.com/articles/oil-rises-as-goldman-sachs-sees-supply-shortfall-1463393830. The public data supporting Figure 1 is set out in Exhibits K & L. *See Crude Oil*, 913 F. Supp. 2d at 52.

## ARGUMENT

## I.   PLAINTIFF LACKS ARTICLE III STANDING.

### A.   Article III Standing Requires An Injury-in-Fact.

Standing "is an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan* v. *Defenders of Wildlife*, 504 U.S. 555, 560 (1992).  The first element of standing is an "injury-in-fact."  To establish an injury-in-fact, a litigant must allege "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Port Washington Teachers' Ass'n* v. *Bd. of Educ. of Port Washington Un. Free Sch. Dist.*, 478 F.3d 494, 498 (2d Cir. 2007) (citing *Lujan*, 504 U.S. at 56) (internal quotation omitted).  The threatened injury must be "certainly impending to constitute injury in fact, and allegations of possible future injury are not sufficient." *Clapper*, 133 S. Ct. at 1147 (*quoting Whitmore* v. *Arkansas*, 495 U.S. 149, 158 (1990)) (internal quotations omitted).  "If a plaintiff has not yet suffered a concrete injury in fact, he or she lacks standing, even though it is possible that in the future such an injury will occur." *Brennan*, 352 F.3d at 65 n.9 (*per curiam*) (*quoting* 15 James Wm. Moore, et al., MOORE'S FEDERAL PRACTICE § 101.71 (3d ed. 2003)).  In all events, "[a] 'concrete' injury must be 'de facto'; that is, it must actually exist." *Spokeo, Inc.* v. *Robins*, 136 S. Ct. 1540, 1548 (2016).

### B.   Plaintiff Fails To Allege an Injury-in-Fact.

Plaintiff has not alleged an injury-in-fact, and cannot do so.  The Complaint is premised on the allegations that the 2014 Notes are now effectively subordinated to the 2015 Notes and that Moody's rating reflects that the 2014 Notes are riskier following the Exchange Offer.  (Compl. ¶ 41.)  These assertions do not satisfy the injury-in-fact requirement.

Plaintiff's theory is that *if* CRC were to enter bankruptcy at some indefinite point in the future, and *if* there were insufficient assets to make creditors whole, then he might receive

less than if the 2015 Notes did not exist.  (Compl. ¶¶ 7, 20, 31, 41.)  This is entirely hypothetical conjecture.  Plaintiff has not alleged that the Exchange Offer decreased CRC's ability to pay future claims, much less that default is imminent.  *See Clapper*, 133 S. Ct. at 1147 ("Although imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative . . . that the injury is *certainly* impending.") (emphasis in original).  The Exchange Offer actually improved CRC's financial condition by reducing its debt by $563 million and increasing its liquidity.  (Compl. ¶ 81.)

Courts routinely find that conjectural injuries fail the injury-in-fact test.  In *Rajamin* v. *Deutsche Bank Nat'l Trust Co.*, 757 F.3d 79 (2d Cir. 2014), for example, the plaintiff alleged injury from various defective assignments of his mortgage.  The plaintiff claimed, among other things, that the defective assignments could enable some other entity to foreclose on his mortgage and that he might have been prevented from selling his house because of a cloud on his title.  *Id.* at 85-86.  The Second Circuit held that these allegations failed the injury-in-fact test because they were "conjectural or hypothetical."  *Id.* at 86.  Similarly, in *SC Note Acquisitions, LLC* v. *Wells Fargo Bank, N.A.*, the plaintiff alleged that the defendants' actions caused a trust to lose its preferred tax status.  934 F. Supp. 2d 516, 526 (E.D.N.Y. 2013).  The court held that this injury was hypothetical because the IRS had not made any determination as to the trust's tax status and "plaintiff has not alleged that the Trust has had any tax liability imposed upon it."  *Id.*

Here, too, Plaintiff's alleged injury—CRC's potential future default on his notes—depends on a series of hypothetical events.  *See Scanlan* v. *Kodak Ret. Income Plan*, 678 F. Supp. 2d 110, 114 (W.D.N.Y. 2010) (finding "threatened injury [of adverse tax consequences] is neither concrete nor imminent, but relies upon an extended series of hypothetical events").  Even if Plaintiff had alleged that the Exchange Offer reduced CRC's ability to pay principal and

interest on the 2014 Notes, which he does not, he would still have failed to plead an injury-in-fact. In *Ross* v. *AXA Equitable Life Insurance Company*, for example, holders of life insurance policies alleged that they had suffered an injury-in-fact as a result of transactions that left the insurer less financially secure, thereby increasing the risk that the insurer would be "unable to pay Plaintiffs' claims when they are eventually made." 115 F. Supp. 3d 424, 437 (S.D.N.Y. 2015). The court determined that this possibility of injury was "far too hypothetical, speculative, and uncertain to constitute an 'imminently threatened injury' worthy of federal judicial intervention." *Id.* (*quoting Summers* v. *Earth Island Institute*, 555 U.S. 488, 492 (2009)). Plaintiff's alleged injury here is at best even more speculative: He asserts that the Exchange Offer injured him simply because the 2015 Notes are effectively senior to the 2014 Notes, which increases the risk that the Company will not be able to pay its claims under the 2014 Notes if—not when—it defaults, without alleging that the Exchange Offer made the Company less financially secure. (Compl. ¶ 63.) In fact, Plaintiff fails to allege any form of injury because the Exchange Offer complied with the disclosures, and rights provided to CRC, in the Indenture.

Plaintiff also cannot allege a plausible, let alone legally sufficient, injury-in-fact from Moody's downgrade of the 2014 Notes following the Exchange Offer. Moody's already had downgraded the 2014 Notes *twice* before the Exchange Offer, concurrently downgrading CRC's first-lien revolving credit facility, which held higher positions in the credit structure than both the 2014 and 2015 Notes. (*See* Compl. ¶ 40.) This history shows that the Exchange Offer did not drive Moody's December 2015 downgrade.[9] More fundamentally, a ratings downgrade, without more, is not sufficiently concrete to constitute an injury-in-fact. It represents an opinion as to the likelihood—not a cause or guarantee—of future default. Even if a downgrade could

---

[9]     This is corroborated by S&P's simultaneous ratings, which attributed the downgrades to plummeting oil prices—not the Exchange Offer. (*See* Exs. D-E.)

increase the risk of future nonpayment, it still would not be sufficiently imminent or concrete to meet the injury-in-fact test. *See Ross*, 115 F. Supp. 3d at 437.

Even assuming, *arguendo*, that a rating agency downgrade could constitute an injury-in-fact, Moody's downgrade cannot do so here because Plaintiff has not asserted that he suffered any economic harm as a result of the downgrade. He does not allege that the downgrade led to an actual default on the notes, or even that the downgrade resulted in lower market value of his notes. On the contrary, the 2014 Notes have substantially increased in value in the seven months since Moody's downgrade. (Ex. L.) A plaintiff cannot establish an injury-in-fact when it received an economic benefit from a challenged transaction. *See In re AOL Time Warner Inc. Sec. & ERISA Litig*, 381 F. Supp. 2d 192, 246 (S.D.N.Y. 2004) (dismissing claims for failure to satisfy injury-in-fact requirement because "[r]ather than alleging any losses on [the] bonds, the allegations of the Amended Complaint reveal that [the] bonds purchased by Lead Plaintiff have actually increased in value").

## II. THE COMPLAINT FAILS TO ALLEGE AN "IMPAIRMENT" NECESSARY TO STATE A CLAIM FOR VIOLATION OF TIA § 316(b).

Besides his lack of standing, Plaintiff's TIA claim fails because he has not suffered an impairment within the meaning of TIA § 316(b). Plaintiff does not allege any missed payments of principal or interest, any right in the Indenture to participate in the Exchange Offer or any action by CRC to affect any assets or guarantees supporting the 2014 Notes. Instead, Plaintiff alleges that the Exchange Offer "practically" impaired his rights by decreasing the likelihood of repayment in the event of a default. (Compl. ¶ 63). Even if this were true, it would not constitute an impairment within the meaning of the TIA. Plaintiff's assertions to the contrary not only distort the plain meaning of TIA § 316(b) and cases interpreting it, but fly in the face of

the Indenture, which granted CRC the right to issue future secured debt. Nothing in TIA § 316(b), or any cases interpreting it, precludes CRC from exercising that right.

The TIA regulates offerings of corporate debt securities, and requires that issuances of such securities be made pursuant to an indenture that meets certain statutory requirements and is registered with the SEC. 15 U.S.C. §§ 77aaa, 77hhh. Section 316(b) provides that "the right of any holder of any indenture security to receive payment of the principal of and interest on such indenture security, on or after the respective due dates expressed in such indenture security, or to institute suit for the enforcement of any such payment on or after such respective dates, shall not be impaired or affected without the consent of such holder."[10] Section 316(b) does not, however, guarantee noteholders an absolute right to payment, give them a right to participate in alternative debt transactions with fundamentally different terms, or protect their debt from the issuance of senior debt. *See Bank of N.Y.* v. *First Millennium, Inc.*, 607 F.3d at 917 ("Nothing in Section 316(b), or the TIA in general, requires that bondholders be afforded 'absolute and unconditional' rights to payment[.]").

Historically, courts applied Section 316(b) only to protect against impairments of noteholders' *legal* rights to receive payment or enforce payment obligations. *See, e.g.*, *Northwestern*, 313 B.R. at 600. More recently, some courts have extended Section 316(b) to certain debt restructurings that do not technically involve a legal impairment of a noteholder's repayment right, but create a practical impairment because they effectively force noteholders to

---

[10] Section 316(b) "regulate[s] and reform[s] prior practice whereby indentures contained provisions that permitted a group of bondholders, often controlled by insiders, to agree to amendments to the indenture that affected the rights of other holders—so-called 'majority' or 'collective' action clauses." *In re Bd. of Dirs. of Multicanal S.A.*, 307 B.R. 384, 388 (Bankr. S.D.N.Y. 2004). To this end, Section 316(b) "protect[s] minority bondholders by prohibiting majority bondholders from collusively agreeing to modify the bond's payment terms," which they can do only pursuant to a majoritarian control provision in an indenture. *Bank of N.Y.* v. *First Millennium, Inc.*, 607 F.3d 905, 917 (2d Cir. 2010).

relinquish claims or involve a transfer or liquidation of substantially all of an issuer's assets. These cases—including *Marblegate I*, currently on appeal to the Second Circuit—are factually inapposite because they involve radically different facts and transactions. Plaintiff here has not suffered either a legal or practical impairment in violation of Section 316(b), as construed by any court. Thus, regardless of the outcome of the *Marblegate I* appeal, Plaintiff's TIA claim fails.

## A.  Plaintiff Has Not Suffered a Legal Impairment.

Section 316(b), by its terms, protects only a noteholder's legal right to receive payment when due or to enforce payment obligations thereafter. *YRC Worldwide Inc.*, 2010 WL 2680336, at *5-8 (discussing historic precedents); *Northwestern*, 313 B.R. at 600 (Bankr. D. Del. 2004); *Ret. Bd. of the Policemen's Annuity and Benefit Fund of Chicago* v. *Bank of New York Mellon*, 914 F. Supp. 2d 422, 432 (S.D.N.Y. 2012) (dismissing TIA claim because plaintiffs failed to respond to defendant's argument that Section 316(b) "only prevents non-consensual impairments to certificateholders' right to demand payment of interest and principal").

In *Northwestern*, for example, noteholders challenged a transaction involving a transfer of a company's assets, allegedly for insufficient value, leaving behind an insolvent entity obligated on the debt. 313 B.R. at 600.  The court held that the transaction did not violate the TIA, because Section 316(b) "applies to the holder's *legal* rights and not the holder's *practical* rights to the principal and interest itself.  Plaintiffs' legal rights were not impaired." *Id.* (emphases in original).  The District of Kansas adopted the same interpretation in *YRC Worldwide*.  There, the plaintiff had argued that, in connection with a debt-for-equity exchange, Section 316(b) required unanimous consent to remove an indenture provision that restricted the issuer's ability to merge or transfer substantially all of its assets, because noteholders would "be denied direct recourse" against the issuer.  2010 WL 2680336, at *7.  The court rejected that argument, holding that "TIA § 316(b) does not provide a guarantee against the [issuer's] default

or its ability to meet its obligations," and so does not preclude transactions that make it "more difficult for holders to receive payment." *Id.*

Northwestern and *YRC Worldwide* confirm that Section 316(b) does not protect against impairments of a noteholder's *practical* right to receive payment when due or to enforce payment obligations thereafter. But even before those decisions, courts had long interpreted Section 316(b) as applying only to impairments of noteholders' legal rights.[11] This line of cases holds that Section 316(b) does not protect against an increased risk that a future payment may be missed, because "there is no guarantee against default." *Northwestern*, 313 B.R. at 600.

Here, Plaintiff asserts merely that his notes are riskier because the secured status of the 2015 Notes renders them effectively senior to his notes, even though the Indenture for the 2014 Notes permitted just such a possibility. He complains not about any legal impairment of his rights, but about the Company's legitimate exercise of *its* legal rights. He does not claim that he has missed principal or interest payments; nor does he allege that CRC altered the payment terms of his notes, impaired his ability to sue for payment, or amended the 2014 Indenture. Because Plaintiff has not alleged that his legal rights have been impaired in any way, he cannot state a claim for violation of Section 316(b).

---

[11]     *See In re Bd. of Dirs. of Multicanal S.A.*, 307 B.R. 384, 389 (Bankr. S.D.N.Y. 2004) (Section 316(b) protects against impairment of noteholders' ability to sue upon default); *McMahan & Co.* v. *Wherehouse Entm't, Inc.*, 859 F. Supp. 743, 748 (S.D.N.Y. 1994), *aff'd in part, rev'd in part*, 65 F.3d 1044 (2d Cir. 1995) ("Section 316(b) pertains to events of payment default where a company has failed to pay out on an indenture security after its maturity date or after an explicit date on which it has come due—in other words, when the right to payment becomes absolute and unconditional."); *Schallitz* v. *Starrett Corp.*, 82 N.Y.S.2d 89, 91 (Sup. Ct. N.Y. Cnty. 1948) (Section 316(b) "forbids postponement only of interest actually due and payable by the terms of the indenture security and does not prohibit the incidental effect upon income interest caused by diminution in dividends from other sources."); *UPIC & Co.* v. *Kinder-Care Learning Ctrs., Inc.*, 793 F. Supp. 448, 452 (S.D.N.Y. 1992) (Section 316(b) only "proscribes certain so-called 'majority action clauses'" by which the majority can modify "a securityholder's right to receive payment of the principal of or interest on the indenture security on the due dates for such payments").

**B.** **Even if Section 316(b) Applies to "Practical" Impairments, Plaintiff has Not Suffered Such an Impairment.**

Even if Section 316(b) were construed more broadly to apply to *practical* impairments, Plaintiff still fails to state a TIA claim. In a departure from the long line of cases limiting Section 316(b) to legal impairments, three decisions from this District adopted a more expansive interpretation of Section 316(b), holding that it also proscribes the absolute practical impairment of a noteholder's rights in narrow circumstances that amount to a legal impairment in all but name. This case is easily distinguishable from those decisions because the Exchange Offer contains none of the indicia of such an impairment.

First, in *Federated Strategic Income Fund* v. *Mechala Group Jamaica Ltd.*, 1999 WL 993648 (S.D.N.Y. Nov. 2, 1999), an issuer sought to complete a tender offer that would become effective only if a majority of noteholders (1) tendered their notes and (2) consented to indenture amendments that would have been binding on all noteholders. *Id.* at *1-3. Following the tender offer, the issuer planned to transfer its assets to its corporate affiliates as part of a corporate restructuring. *Id*. The proposed amendments were designed to allow an intercompany transfer of assets and a release of certain guarantees, which the indenture prohibited. *Id.* at *6. The court enjoined the transaction, holding that the release of the inter-corporate guarantees and divestment of assets violated Section 316(b), because it left "no meaningful recourse for plaintiffs or any noteholder who concludes this is a bad deal and chooses not to tender[.]" *Id.*

Next, in *Marblegate I*, Judge Failla concluded that Section 316(b) applied to a similar scenario involving a coercive out-of-court restructuring of substantially all of a company's assets. The issuer offered to exchange unsecured notes in return for a package of debt and equity in a new company. To coerce unsecured noteholders to make the exchange, the issuer struck a deal with certain secured creditors that required those creditors to (1) trigger the

release of a parent guaranty on the unsecured notes, (2) foreclose on substantially all of the issuer's assets, and (3) transfer those assets to a new company, leaving the issuer devoid of assets. *Marblegate I*, 75 F. Supp. 3d at 600-02, 615. Thus, any noteholders rejecting the deal would be left holding debt guaranteed by an insolvent issuer without assets. *Id.* at 601-602, 615.

On these facts, the court held that the TIA prohibits practical as well as formal modifications of indentures, but "only when such modifications effect an involuntary debt restructuring." *Id.* at 614. The court explained that the proposed restructuring, and in particular the asset transfer mechanism, would "effect a *complete* impairment of dissenters' right to receive payment." *Id.* at 615 (emphasis supplied). Restricting its holding to the narrow facts before it, the court stated that "[t]he record before this Court . . . leaves little question that the [transaction] is precisely the type of debt reorganization that the Trust Indenture Act is designed to preclude." *Id.* The court went to pains to emphasize that its decision "does not contravene the decisions that have allowed preexisting subordination terms to survive a challenge." *Id.* at 614.

Following *Marblegate*, Judge Scheindlin issued two opinions in cases brought by indenture trustees and the creditors of Caesars Entertainment Corporation ("CEC"). There, CEC proposed asset transfers that would have rendered judgment-proof the subsidiary that issued the original notes. In the first case, after two private equity firms acquired CEC, the company began transferring assets out of the operating subsidiary that had issued the debt with the ultimate plan of placing that subsidiary into bankruptcy. *MeehanCombs*, 80 F. Supp. 3d at 510 . The company then offered holders a premium in exchange for (1) majority consent to remove CEC's guaranty of the debt and (2) their consent to allow further transfers of the subsidiary's assets. *Id*. The court denied a motion to dismiss the plaintiffs' TIA claims, finding that the allegations that the "[t]ransaction stripped plaintiffs of the valuable CEC Guarantees leaving them with an empty

right to assert a payment default from an insolvent issuer are sufficient to state a claim under Section 316(b)." *Id.* at 516. In the second decision, Judge Scheindlin concluded that a debt reorganization might violate Section 316(b) when it "leav[es] some noteholders with an unaltered formal right to payment, but no practical ability to receive payment." *MeehanCombs*, at 510; *BOKF, N.A.* v. *Caesars Entertainment Corp.*, 144 F. Supp. 3d 459, 474 (S.D.N.Y. 2015).

Each of these cases eschewed a reading of TIA § 316(b) that would potentially allow, in the unique circumstances of those cases, debt issuers to achieve by structure what the statute does not permit to be effected by amendment of legal rights, *i.e.*, through transactions that forcibly negate or render impossible dissenting noteholders' ability to receive payment of principal or interest. Plaintiff, who complains about an offering whose prospect was fully disclosed in the Indenture, comes nowhere close to pleading similar facts here:

- The Exchange Offer did not dispose of or transfer any assets, much less assets backing the 2014 Notes. *Cf. BOKF*, 144 F. Supp. 3d at 463; *Marblegate I*, 75 F. Supp. 3d at 601-02; *Federated*, 1999 WL 993648, at *6.

- The Exchange Offer did not modify or remove any guaranty on the 2014 Notes. *Cf. MeehanCombs*, 80 F. Supp. 3d at 511; *Marblegate I*, 75 F. Supp. 3d at 600-02; *Federated*, 1999 WL 993648 at *6.

- The Exchange Offer did not amend or modify any terms of the Indenture; it was entirely consistent with it. *Cf. BOKF*, 144 F. Supp. 3d at 465-64.

- The Exchange Offer did not force holders of the 2014 Notes to look to an insolvent issuer for payments of principal and interest, and there is no allegation that the 2014 Notes have defaulted or are reasonably likely to do so imminently. *Cf. id.* at 464; *Marblegate I*, 75 F. Supp. 3d at 601-02; *Federated*, 1999 WL 993648, at *6.

- The Exchange Offer is not the type of domineering majority-action that Congress enacted Section 316(b) to prevent. *See BOKF*, 75 F. Supp. 3d at 473 ("[T]he purpose of the right enunciated in section 316(b) [is] to protect minority bondholders against debt reorganizations resulting from a majority vote, outside of judicial supervision."); *see also Multicanal*, 307 B.R. at 388. Here, the noteholders did not even conduct a vote, and Plaintiff's rights were not altered in any way by majority action.

In sum, nothing in prior case law suggests that Section 316(b) prohibits the Exchange Offer merely because the 2015 Notes are secured and, thus, effectively senior to the 2014 Notes. *See First Millennium*, 607 F.3d at 917 ("Nothing in Section 316(b), or the TIA in general, requires that bondholders be afforded 'absolute and unconditional' rights to payment[.]"). Plaintiff's allegation that the Exchange Offer increased the risk of default on his notes by rendering them effectively subordinate to the 2015 Notes does not suffice to state a claim under any plausible reading of Section 316(b). His TIA claim should be dismissed.

## III. PLAINTIFF'S STATE LAW CLAIMS ARE LEGALLY DEFECTIVE.

### A. The Indenture's "No-Action" Clause Bars the State Law Claims.

In addition to his lack of Article III standing, Plaintiff lacks standing to pursue his state law claims because he has not complied with the Indenture's "no-action" clause. That clause required Plaintiff, before suing, to (1) notify the trustee of the alleged default, (2) marshal support of investors holding at least 25% of the interests in the 2014 Notes to direct the trustee, (3) offer the trustee a reasonable indemnity for costs, and (4) allow the trustee 60 days to act. (Indenture § 6.06.) These requirements "protect issuers from the expense involved in defending [individual] lawsuits that are either frivolous or otherwise not in the economic interest of the corporation and its creditors." *Quadrant Structured Prods. Co., Ltd.* v. *Vertin*, 23 N.Y.3d 549, 565-66 (N.Y.) (internal quotes omitted). They also "protect against the exercise of poor judgment by a single bondholder or a small group of bondholders, who might otherwise bring a suit against the issuer that most bondholders would consider not to be in their collective economic interest." *SC Note*, 934 F. Supp. 2d at 531 (quotation omitted); *Ellington Credit Fund, Ltd.* v. *Select Portfolio Servicing, Inc.*, 837 F. Supp. 2d 162, 184 (S.D.N.Y. 2011) (no-action clauses are intended to prevent "a small group of certificateholders" from imposing expense of litigation on other holders who do not view litigation as in their "collective economic interest").

For these reasons, courts "routinely enforce" no-action clauses to bar claims where a noteholder has failed to comply with such requirements. *SC Note*, 934 F. Supp. 2d at 531 (collecting cases).

Here, Plaintiff does not allege that he complied with the "no-action" clause. (Compl. ¶¶ 47-48.) Rather, he offers two insufficient reasons for ignoring it. *First*, Plaintiff pleads that it "was not possible due to the time restraints of the Exchange Offer," because the Exchange Offer was scheduled to close a month after it was announced, and the "no-action" clause contains a 60-day period for the trustee to evaluate the requested suit. This argument is specious. Plaintiff waited until four months *after* the close of the Exchange Offer to file this suit—negating his contention that some sort of time constraint on his lawsuit required him to circumvent the Indenture's terms. *Second*, Plaintiff alleges that he "had good reason to doubt the impartiality any written notice provided to the Trustee would receive" because Wells Fargo Bank, N.A. ("Wells Fargo") is the indenture trustee and Wells Fargo's president and chief operating officer is a member of CRC's Board of Directors. (Compl. ¶ 48.) Such speculation cannot excuse Plaintiff's failure to comply with Section 6.06. As is common, the Indenture specifies Wells Fargo's narrow duties as trustee. (Indenture § 7.01.) The "no-action" clause does not permit Wells Fargo to exercise discretion—it is satisfied solely by the occurrence of steps set out in Section 6.06. Thus, had Plaintiff complied with the requirements of Section 6.06, there is no basis to infer that Wells Fargo would have ignored the direction to sue. And even if Wells Fargo declined to sue, Plaintiff would be authorized to act unilaterally after sixty days.

**B.     The Breach of Contract Claim Merely Replicates the TIA Claim and Fails for the Same Reasons.**

Court Two alleges a breach of Section 6.07 of the Indenture, which provides:

> Notwithstanding any other provision of this Indenture, the right of any Holder of a Note to receive payment of principal, premium, if any, or interest on such Note, on or after the respective due dates expressed in such Note, or to bring suit for the enforcement of any such payment on

or after such respective dates, shall not be impaired or affected without the consent of such Holder.

This contract language mimics TIA § 316(b), as required by TIA § 318(c).  This claim thus fails for the same reasons the TIA claim fails.[12]  (*See* Part II, *supra*; *see also Almog* v. *Arab Bank, PLC*, 471 F. Supp. 2d 257, 294 (E.D.N.Y. 2007) (dismissing "redundant" claims).)

### C. The Claim for Breach of the Duty of Good Faith and Fair Dealing Fails Under the Plain Terms of the Indenture.

Unable to point to any terms of the Indenture that were breached by the Exchange Offer, Plaintiff tries to rewrite the Indenture under the guise of a claim for breach of the duty of good faith and fair dealing.  Such a claim, however, is "not proper when a written agreement governs the subject matter of the claim."  *RJ Capital* v. *Lexington Capital Funding*, 2011 WL 3251554, at *13 (S.D.N.Y. July 28, 2011) (citations omitted).  The implied duty of good faith and fair dealing "can only impose an obligation consistent with other mutually agreed upon terms in the contract."  *Broder* v. *Cablevision Sys. Corp.*, 418 F.3d 187, 198 (2d Cir. 2005) (internal quotation omitted).  It cannot "add to the contract a substantive provision not included by the parties."  *Id.* (*quoting Sabetay* v. *Sterling Drug, Inc.*, 69 N.Y.2d 329, 335 (1987)).  Fundamentally, "if the allegations do not go beyond the statement of a mere contract breach and, relying on the same alleged acts, simply seek the same damages or other relief already claimed in a companion contract cause of action, they may be disregarded as superfluous as no additional claim is actually stated."  *MeehanCombs*, 80 F. Supp. 3d at 514.

---

[12]     Plaintiff also asserts that CRC discriminated against non-QIB noteholders by making the Exchange Offer a private placement in supposed contravention of three provisions in the Indenture.  (*See* Compl. ¶ 44.)  The first provision, Section 3.02, applies only to CRC's optional unilateral redemption of the 2014 Notes as described in Section 3.07.  The second provision, Section 4.09, applies only in the event of a Change of Control, which the Indenture defines as a takeover, sale or liquidation of the Company.  The last provision, Section 9.02, relates to amendments of core terms of the Indenture, such as the voting and payment rights.  The Exchange Offer implicates none of these provisions.

Plaintiff alleges that CRC "unfairly discriminat[ed] against non-QIB holders of the Class Notes and subordinat[ed] their claims to the 2015 Notes without consent," but does not point to any Indenture provision barring differential treatment of bondholders in exchange offers or any provision of the Indenture entitling him to participate. (*See* Compl. ¶ 78.) To the extent that an indenture does not "expressly restrict the rights of the issuer, the issuer is left with the freedom to act, subject only to the boundaries of other positive law." *In re Loral Space & Commc'ns Inc.*, 2008 WL 4293781, at *35 (Del. Ch. Sept. 19, 2008) (applying New York law). Here, the Indenture permitted CRC to issue new debt senior to the 2014 Notes. Plaintiff's claim in Count Three for breach of an implied duty of good faith and fair dealing should be dismissed.

### D. The Unjust Enrichment Claim Is Duplicative of Plaintiff's Contract Claims.

Count Four (unjust enrichment) should be dismissed because it is duplicative of the TIA and breach of contract claims. The asserted unjust and inequitable conduct— "Defendant's violations of the TIA and a breach of the Indenture"—is the exact conduct on which those other counts allegedly are based. (Compl. ¶ 82.) Under New York law, "an unjust enrichment claim is not available where it simply duplicates, or replaces, a conventional contract or tort claim." *Corsello* v. *Verizon N.Y., Inc.*, 967 N.E.2d 1177, 1185 (N.Y. 2012)). Moreover, there was no "ill-gotten gain" because the Exchange Offer complied fully with the Indenture. (*See* Indenture § 4.07.) Even if it had not, CRC cannot be said to have obtained an unjust benefit at Plaintiff's expense, given that the debt reduction achieved through the Exchange Offer is anything but a deprivation of Plaintiff. (*See* Compl. ¶ 81.) Plaintiff, and CRC's other noteholders, all benefited from the Exchange Offer because CRC enhanced its liquidity and substantially reduced its debt. Plaintiff fails to plead how the aggregate debt reduction resulting from the Exchange Offer unjustly enriched CRC or usurped any benefit of the noteholders.

### E. The Declaratory Relief Claim Merely Repeats the Other Causes of Action.

Count Five (declaratory judgment) also duplicates the TIA and contract claims and should be dismissed because it "would serve no 'useful purpose' in the overall context of this litigation." *Fleisher* v. *Phoenix Life Ins. Co.*, 858 F. Supp. 2d 290, 302 (S.D.N.Y. 2012). The Complaint acknowledges that Count Five is duplicative, as Counts One and Two already seek "the declaratory relief sought in Count Five." (Compl. ¶¶ 65, 72.) Dismissal of a declaratory judgment claim is appropriate in these circumstances because the claim seeks "resolution of legal issues that will, of necessity, be resolved in the course of the litigation of the other causes of action." *Fleisher*, 858 F. Supp. 2d at 302 (internal quote omitted). Moreover, there is no feasible means to unwind the Exchange Offer and the issuance of the 2015 Notes, which have now traded in the market for seven months. Declaratory relief is simply inapt. *Chiste* v. *Hotels.com L.P.*, 756 F. Supp. 2d 382, 407 (S.D.N.Y. 2010) ("'There is no basis for declaratory relief where only past acts are involved.'") (internal citation omitted).

### CONCLUSION

For the foregoing reasons, CRC respectfully requests that the Court dismiss the Complaint in its entirety with prejudice and grant to it such other and further relief as the Court deems just and proper.

Dated: New York, New York
July 8, 2016

Respectfully submitted,

*/S/ Theodore Edelman*

Theodore Edelman
Darrell S. Cafasso
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004-2498
Telephone:  (212) 558-4000
Facsimile:  (212) 558-3588

*Counsel for Defendant California Resources Corporation*