UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

BRAD BARKAU, Individually and on Behalf
of All Others Similarly Situated,

                Plaintiff,

      v.

CALIFORNIA RESOURCES
CORPORATION,

                Defendant.

No. 16-cv-02971 (RA)

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS THE COMPLAINT

**LEVI & KORSINSKY LLP**
Eduard Korsinsky
30 Broad Street, 24th Floor
New York, NY 10004
Tel: (212) 363-7500
Fax: (212) 363-7171

*Attorney for Plaintiff*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................. 1

STATEMENT OF FACTS ...................................................................................... 4

ARGUMENT ......................................................................................................... 6

   I.  LEGAL STANDARD ................................................................................... 6

  II.  THE COMPLAINT SUFFICIENTLY ALLEGES PLAINTIFF'S INJURIES
     SUSTAINED AS A RESULT OF THE EXCHANGE OFFER ........................................ 7

  III. THE COMPLAINT SUFFICENTLY ALLEGES THAT PLAINTIFF'S CLASS NOTES
     WERE IMPAIRED AND/OR AFFECTED IN VIOLATION OF THE TIA & THE
     INDENTURE .................................................................................................... 12

     A.  The TIA Provides For The Unequivocal Right For Holders To Be Free From
        Nonconsensual Actions That Affect Their Right To Principal And Interest .............. 12

     B.  The Exchange Offer Affected And Impaired Plaintiff's Right To Receive Principal
        And Interest On The Class Notes .................................................................. 14

  IV. THE INDENTURE'S NO-ACTION CLAUSE DOES NOT BAR PLAINTIFF'S STATE
     LAW CLAIMS ................................................................................................ 18

  V.  THE COMPLAINT ADEQUATELY ALLEGES A CLAIM FOR BREACH OF
     CONTRACT .................................................................................................... 21

  VI. THE COMPLAINT ADEQUATELY ALLEGES A CLAIM FOR BREACH OF THE
     IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING ............................. 21

  VII. THE COMPLAINT ADEQUATELY ALLEGES A CLAIM FOR UNJUST
     ENRICHMENT ................................................................................................ 22

  VIII. THE COMPLAINT ADEQUATELY ALLEGES A CLAIM FOR DECLARATORY
     JUDGMENT ................................................................................................... 23

CONCLUSION ................................................................................................... 25

**Cases**

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ............................................................................................................. 6

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ............................................................................................................. 6

*Bluebird Partners, L.P. v. First Fidelity Bank, N.A.*,
    85 F.3d 970 (2d Cir.1996) ................................................................................................ 12

*BOKF, N.A. v. Caesars Entertainment Corp.*,
    Nos. 15-cv-1561 (SAS), 15-CV-4634 (SAS), 2015 WL 5076785 (S.D.N.Y. Aug 27 2015)....
    ........................................................................................................................... 3, 12, 14

*Briarpatch Ltd., L.P v. Phoenix Pictures, Inc.*,
    373 F.3d 296 (2d Cir. 2004) ............................................................................................ 22

*Buday v. New York Yankees P'ship*,
    486 F. App'x 894 (2d Cir. 2012) ...................................................................................... 7

Clapper v. Amnesity International USA,
    133 S.Ct 1138 (2013) ......................................................................................................... 7

*Coal. of Watershed Towns v. U.S. E.P.A.*,
    552 F.3d 216 (2d Cir. 2008) ............................................................................................. 7

Cruden v. Bank of New York,
    957 F.2d 961 (2d Cir.1992) .............................................................................................. 19

*Dalton v. Educ. Testing Serv.*,
    87 N.Y.2d 384 (1995) ...................................................................................................... 21

*Diesel Props S.r.l. v. Greystone Bus. Credit II LLC*,
    631 F.3d 42 (2d Cir. 2011) .............................................................................................. 21

*Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co.*,
    411 F.3d 384 (2d Cir. 2005) ............................................................................................ 23

*EM Ltd. v. Republic of Argentina*,
    131 F. App'x 745 (2d Cir. 2005) .................................................................................... 16

*Eternity Glob. Master Fund Ltd. v. Morgan Guar. Trust Co. of New York*,
    No. 02 CIV.1312 (LMM), 2002 WL 31426310 (S.D.N.Y. Oct. 29, 2002) .......................... 16

*Federated Strategic Income Fund v. Mechala Grp. Jamaica Ltd.*,
    No. 99 CIV 10517, 1999 WL 993648 (S.D.N.Y. Nov. 2 1999) ............................. 3, 14, 15, 17

*Fleisher* v. *Phoenix Life Ins. Co.*,
    858 F. Supp. 2d 290 (S.D.N.Y. 2012) ...................................................................... 24

*Gaia House Mezz LLC v. State St. Bank & Trust Co.*,
    720 F.3d 84 (2d Cir. 2013) ........................................................................... 21, 22

*Ganino v. Citizens Utilities Co.*,
    228 F.3d 154 (2d Cir. 2000) .................................................................................. 5

*Goldman v. Simon Prop. Grp., Inc.*,
    58 A.D.3d 208 (2d Dep't 2008) ......................................................................... 23

*GSO Coastline Credit Partners LP v. Glob. A&T Elecs. Ltd.*,
    139 A.D.3d 409 (N.Y. App. Div. 2016) ............................................................. 24

*Hollingsworth v. Perry*,
    133 S. Ct. 2652 (2013) .......................................................................................... 7

*Howe v. Bank of New York Mellon*,
    783 F. Supp. 2d 466 (S.D.N.Y. 2011) ..................................................... 3, 18, 19

*In re AOL Time Warner Inc. Sec. & ERISA Litig*,
    381 F. Supp. 2d 192 (S.D.N.Y. 2004) ............................................................... 11

*In re Northwestern Corp.*,
    313 B.R. 595 (Bankr. D. Del. 2004) ................................................................. 14

*Kramer v. Lockwood Pension Servs.*,
    653 F. Supp. 2d 354 (S.D.N.Y. 2009) ............................................................... 23

*Kuhne v. Cohen & Slamowitz, LLP*,
    579 F.3d 189 (2d Cir.2009) ............................................................................... 13

*Landmark Ventures, Inc. v. Wave Sys. Corp.*,
    No. 12-3634, 2013 WL 909184 (2d Cir. Mar. 12, 2013) ................................... 21

Lujan v. Defenders of Wildlife,
    504 U.S. 555 (1992) ....................................................................................... 7, 10

*Marblegate Asset Mgmt v. Educ Mgmt Corp*.
    111 F. Supp. 3d 542 (S.D.N.Y. 2015) ............................................................. 3, 14

*Marblegate Asset Mgmt. v. Educ. Mgmt. Corp.*,
    75 F. Supp. 3d 592 (S.D.N.Y. 2014) ...................................................... 13, 14, 17

*MeehanCombs Global Credit Opportunities Funds, LP v. Caesars Entertainment Corp.*,
    80 F. Supp. 3d 507 (S.D.N.Y 2015) ...................................................... 3, 13, 14, 21

*Metro. W. Asset Mgmt., LLC v. Magnus Funding, Ltd.*,
No. 03 CIV. 5539 (NRB), 2004 WL 1444868 (S.D.N.Y. June 25, 2004).................. 18, 19, 20

*NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*,
693 F.3d 145 (2d Cir. 2012).................................................................. 2, 9, 10, 11

*Oaktree Capital Mgmt., LLC v. Spectrasite Holdings, Inc.*,
No. CIV.A. 02-548 JJF, 2002 WL 32173072 (D. Del. June 25, 2002) ...................... 15, 16, 17

*Penn. Mut. Life Ins. Co. v. Wolk*,
739 F. Supp. 2d 387 (S.D.N.Y. 2010)................................................................. 24

*Rajamin v. Deutsche Bank Nat'l Trust Co.*,
757 F.3d 79 (2d Cir. 2014)............................................................................. 12

Ret. Bd. of the *Policemen's Annuity & Benefit Fund of City of Chicago v. Bank of Am., NA*,
907 F. Supp. 2d 536 (S.D.N.Y. 2012)............................................................. 9, 14

*Ross* v. *AXA Equitable Life Insurance Company*,
115 F. Supp. 3d 424 (S.D.N.Y. 2015)................................................................ 12

*Royal Park Investments SA/NV v. HSBC Bank USA, Nat. Ass'n*,
109 F. Supp. 3d 587 (S.D.N.Y. 2015)................................................................. 9

*SC Note Acquisitions LLC v. Wells Fargo Bank*,
N.A., 934 F.Supp.2d 516 (E.D.N.Y. 2013)........................................................... 12

*Scanlan v. Kodak Ret. Income Plan*,
678 F.Supp.2d 110 (W.D.N.Y. 2010) .................................................................. 12

*Scheuer v. Rhodes*,
416 U.S. 232 (1974) ........................................................................................ 7

*Susan B. Anthony List v. Driehaus*,
134 S. Ct. 2334, 189 L. Ed. 2d 246 (2014) .................................................... 2, 7, 9

*Travelers Int'l, A.G. v. Trans World Airlines, Inc.*,
41 F.3d 1570 (2d Cir.1994)............................................................................... 21

*YRC Worldwide Inc.* v. *Deutsche Bank Trust Co. Americas*,
2010 WL 2680336 (D. Kan. July 1, 2010) ........................................................... 14

**Statutes**

15 U.S.C. § 77  (Trust Indenture Act, Section 316(b))....................................... passim

28 U.S.C. § 2201 ..................................................................................... 22, 23

**Other Authorities**

H.R. Rep. 76–1016 (1939) ........................................................................................................ 13

Investopedia, Definition of "Interest Coverage Ratio,"
    http://www.investopedia.com/terms/i/interestcoverageratio.asp#ixzz4HRi3iILT (last visited
    September 7, 2016 ............................................................................................................... 11

Moody's Investors Service, *Rating Symbols and Definitions*, (July 2016), *available at*
    https://www.moodys.com/sites/products/AboutMoodysRatingsAttachments/MoodysRatingS
    ymbolsandDefinitions.pdf ...................................................................................................... 8

S.Rep. No. 76–248 (1939) ....................................................................................................... 13

**Rules**

Fed. R. Civ. P. 12 ................................................................................................................. 6, 7

Fed. R. Civ. P. 15 .................................................................................................................. 25

Fed. R. Civ. P. 8 ................................................................................................................... 2, 6

**Regulations**

17 C.F.R. § 230.144 ................................................................................................................ 4

## PRELIMINARY STATEMENT

Plaintiff Brad Barkau ("Plaintiff") brought this action individually and on behalf of all other holders of California Resources Corporation's ("California Resources" or the "Company") Class Notes (defined below), who were prohibited from participating in the Company's distressed private Exchange Offer (defined below). Pursuant to the Exchange Offer, the Company provided predominantly large investors with the opportunity to exchange their unsecured Class Notes for newly issued notes, which bear a higher interest rate and primed the Class Notes with a second-priority lien on all of the Company's property and assets (the "New Secured Notes"). Although the Class Notes were registered and provided for only one set of rights under the governing indenture and the Trust Indenture Act of 1939 (the "TIA" or the "Trust Indenture Act"), 15 U.S.C. §§ 77aaa-77bbbb, Plaintiff and other non-high net worth individuals were excluded from the Exchange Offer.

The Exchange Offer was an extremely coercive but lucrative deal to those holders of the Class Notes, who were afforded the opportunity to participate. Prior to the close of the Exchange Offer, so many holders sought to exchange their Class Notes for the New Secured Notes, that California Resources doubled its initial offer to accept $1 billion in aggregate principal amount of Class Notes to $2.8125 billion. Ultimately, the Company received over $3.6 billion in aggregate principal amount in tendered the Class Notes.

Eligible holders rushed to tender their Class Notes due to the Company's dismal state of financial affairs. California Resources has incurred a debilitating amount of indebtedness and is unable to generate positive cash flow. (Def. Br. at 2; ¶ 15.) In a private Offering Memorandum, which was not provided to Plaintiff and other small holders of the Class Notes, California Resources emphasizes the fact that due to the "substantial indebtedness" it has incurred, "there

continues to be **substantial risk** that [it] could be, among other things, unable to repay the [Class] Notes at maturity." (¶ 31 (emphasis added); *see also* ¶¶ 40 & 42.) As a result, Defendant's actions have impaired and affected Plaintiff's ability to recover principal and interest owed on their Class Notes, in violation of Section 316(b) of the TIA ("Section 316(b)"), 15 U.S.C. § 77ppp(b), and the terms of the October 2014 indenture (the "Indenture") governing the Class Notes.

Defendant's attempts to selectively read the allegations contained in the Complaint and misconstrue its claims are unconvincing. The Complaint easily satisfies the notice pleading requirements of Fed. R. Civ. P. 8. Specifically, Plaintiff alleges, in great detail, the numerous ways in which Defendant impaired and affected Plaintiff's ability to recover payment of principal and interest on the Class Notes. (*See e.g.,* ¶¶31, 40, 42.) In this regard, Plaintiff has sufficiently established an injury under Article III due to: (1) California Resources' substantial indebtedness and overall deteriorating financial condition, (2) the increased interest expenses as a result of the New Secured Notes higher interest rate, and (3) the subordination of the Class Notes to the New Secured Notes. (¶¶31, 41); *see Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2341, 189 L. Ed. 2d 246 (2014) (holding that even allegations of a future injury are sufficient where there is a "substantial risk" that the harm will occur). Moreover, by placing additional liens on the Company's assets, ahead of the Class Notes, Defendant caused a ratings downgrade and diminution in the value of Plaintiff's holdings. *See e.g., NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145, 166 (2d Cir. 2012).

In accordance with this District's unwavering precedent of upholding noteholders' right to be free from nonconsensual transactions that impair or affect their right to payment, Defendant's actions violate Plaintiff's rights under Section 316(b) of the TIA, and its parallel Section 6.07 of the Indenture. *See Federated Strategic Income Fund v. Mechala Grp. Jamaica Ltd.,* No. 99 CIV

10517, 1999 WL 993648, at *7 (S.D.N.Y. Nov. 2 1999); *MeehanCombs Global Credit Opportunities Funds, LP v. Caesars Entertainment Corp.,* 80 F. Supp. 3d 507, 516 (S.D.N.Y 2015); *BOKF, N.A. v. Caesars Entertainment Corp.,* Nos. 15-cv-1561 (SAS), 15-CV-4634 (SAS), 2015 WL 5076785 at *4 (S.D.N.Y. Aug 27 2015); *Marblegate Asset Mgmt v. Educ Mgmt Corp (Marblegate II).* 111 F. Supp. 3d 542, 555 (S.D.N.Y. 2015).

In addition, contrary to Defendant's assertion (Def. Br. at 21-22), the "no-action" clause in Section 6.06 of the Indenture poses no bar to the state law claims asserted in the Complaint. First, the no-action clause is interpreted, and applied based on the terms contained therein. Here, Section 6.06 of the Indenture provides that an "Event of Default" must occur as a precedent to its application. Since an "Event of Default," as defined by Section 6.01 of the Indenture did not occur, and could not have been effectuated by Plaintiff, the no-action clause does not apply. *See Howe v. Bank of New York Mellon*, 783 F. Supp. 2d 466 (S.D.N.Y. 2011). Second, by its explicit terms this provision does not "apply to a suit instituted by a Holder of a Note of such series for the enforcement of the payment of the principal of, premium, if any, or interest[.]" (Indenture, 6.06.)

Finally, Defendant's argument that Plaintiff's state law claims are legally defective under New York law also fails. (Def. Br. at 5-6.) Specifically, Defendant argues that Counts Two (Breach of Contract), Three (Breach of the Covenant of Good Faith and Fair Dealing), Four (Unjust Enrichment), and Five (Declaratory Judgment) are duplicative of each other and/or Count One (Violations of § 316 of the TIA) and therefore should be dismissed. New York courts and numerous courts in this District, however, have rejected similar challenges at the pleading stage.

## STATEMENT OF FACTS

*The Class Notes and the Exchange Offer*

California Resources, like "much of the global exploration and production industry is challenged at current price levels, putting pressure on [its] ability to generate positive cash flow and access capital." (¶ 15; *see also* ¶¶ 18-20, 40.) Consequently, on November 12, 2015, California Resources announced the commencement of a private exchange offer (the "Exchange Offer") for up to $1 billion in aggregate principal amount of its: (i) 5% Notes due 2020 (CUSIP 13057QAB3; 13057QAA5; U1303AAA4); (ii) 5½% Notes due 2021 (CUSIP 13057QAD9); and (iii) 6% Notes due 2024 (CUSIP 13057QAF4; 13057QAE7; U1303AAC0) (collectively, the "Class Notes"), in exchange for newly issued 8% Second Lien Notes due in 2022 (the "New Secured Notes"). (¶¶ 1-2.[1]) At all relevant times to this action, the Class Notes were registered and publicly traded without any prerequisites. (¶ 2.) However, only Qualified Institutional Buyers ("QIBs")[2] and non-U.S. persons within the meaning of SEC Rule 902(k) of Regulation S, promulgated under the Securities Act of 1933 (the "Securities Act"), were eligible to participate in the Exchange Offer.

The opportunity to participate in the Exchange Offer was so attractive to those eligible to participate that the Company more than doubled its initial offer to accept $1 billion in aggregate principal amount of Class Notes to $2.8125 billion, when over three times the initial amount was tendered to be exchanged for the New Secured Notes. (¶¶ 33-34.) When the Exchange Offer closed less than a month after it was first announced over $3.6 billion in aggregate principal amount of the Class Notes were tendered. (¶ 36.)

---

[1] References to "¶ _" refer to Plaintiff's Complaint in this action, filed on April 21, 2016. Any defined terms shall have the same definition as provided for in the Complaint.

[2] QIBs are generally an entity that owns and invests on a discretionary basis at least $100 million. 17 C.F.R. § 230.144A.

The terms and conditions of the Exchange Offer were set forth in the private Offering Memorandum, which was not provided to Plaintiff and other non-eligible holders of the Class Notes. (¶ 2.) In the Offering Memorandum, the Company detailed numerous risks and harms that the Class Notes would suffer in connection with the Exchange Offer. (¶ 31.) Notably, the full extent of harm the Class Notes would suffer as a result of Defendant's actions was not completely revealed to Plaintiff until April 15, 2016, when Plaintiff's counsel was able to obtain a copy of the undisclosed Offering Memorandum. (¶ 31.) While the Company recorded a deferred gain of approximately $560 million in connection with the Exchange Offer, the issuance of the New Secured Notes, which bear a higher interest rate than the Class Notes, also resulted in an additional $21 million per year in interest expenses. (¶ 39.) Accordingly, in response to the Exchange Offer, Moody's downgraded its overall rating for California Resources and the Class Notes. (¶ 40.) Moody's rationale for the downgrade was, *inter alia*, the Company's increased interest expenses, and its poor liquidity and credit metrics. (¶ 40.)

Consequently, Plaintiff's practical ability to recover payment of principal and interest under the Indentures and the TIA has been affected and impaired. ¶¶60-71. As a result, the Class Notes' value has fallen considerably, even though the price of crude oil has recovered (and appreciated) since the Exchange Offer was announced. At this point, the market price for the Class Notes have declined over 20%.[3]

### Plaintiff's Rights Under Section 316(b) of the Trust Indenture Act and the Indenture

The Class Notes were issued pursuant to the Indenture, which is qualified by the TIA. (¶ 61.) Throughout the contract, the Indenture, in accordance with the purpose of the TIA, provides for the equal treatment of all holders of the Class Notes. (¶ 44). Specifically, Section 316(b)

---

[3] "[T]he district court may take judicial notice of well-publicized stock prices[.]" *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 167 (2d Cir. 2000).

provides a federally protected right for noteholders to receive payments due to them, which may not be impaired without their consent. (¶51.) Section 6.07 of the Indenture, is nearly identical to Section 316(b) of the TIA, which provides:

> ***Notwithstanding any other provision of the indenture to be qualified***, ***the right of any holder*** of any indenture security ***to receive payment of the principal of and interest on such indenture security***, on or after the respective due dates expressed in such indenture security, ***or to institute suit for the enforcement of any such payment*** on or after such respective dates, ***shall not be impaired or affected without the consent of such holder*** . . . .

15 U.S.C. § 77ppp(b) (emphasis added).

Despite the clear language in the Indenture for all holders of the Class Notes to be treated equally, the Company effectuated the Exchange Offer, which unfairly caused harm to the Class Notes held by Plaintiff and other non-QIBs, in violation of the covenant of good faith and fair dealing, implied in every New York contract. (¶¶ 4, 75-78.) In light of the pervasive covenants providing for the equal treatment of all Class Notes, it was unforeseeable to Plaintiff for his Class Notes to be subject to increase risk and subordinated on a non-pro rata basis. (¶¶ 5, 7, 44.) For these reasons, Defendant's actions deprived Plaintiff of the benefit of his bargain. (¶¶ 7, 75-83.)

<u>**ARGUMENT**</u>

## I. **LEGAL STANDARD**

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a complaint must contain only enough factual matter to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A motion under Rule 12(b)(6) such as Defendant's motion here, requires a court to determine whether or not it contains a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "[I]n passing on a motion to dismiss, whether on the ground of lack of jurisdiction over the subject matter or for failure to state a cause of action, the

allegations of the complaint should be construe favorably to the pleader." *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S. Ct. 1683, 1686, 40 L. Ed. 2d 90 (1974); *accord Buday v. New York Yankees P'ship*, 486 F. App'x 894, 895 (2d Cir. 2012)(when considering a motion to dismiss under Rule 12(b)(1), the Court "must accept as true all material facts alleged in the complaint and draw all reasonable inferences in the plaintiff's favor.").

## II.  THE COMPLAINT SUFFICIENTLY ALLEGES PLAINTIFF'S INJURIES SUSTAINED AS A RESULT OF THE EXCHANGE OFFER

To have standing, a plaintiff must prove that "he has suffered a concrete and particularized injury that is fairly traceable to the challenged conduct, and is likely to be redressed by a favorable judicial decision." *Hollingsworth v. Perry*, 133 S. Ct. 2652, 2661, 186 L. Ed. 2d 768 (2013) (citing *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)). An injury-in-fact occurs where a plaintiff has suffered "an invasion of a legally protected interest that is 'concrete and particularized ... and [ ] actual or imminent, not conjectural or hypothetical'" *Coal. of Watershed Towns v. U.S. E.P.A.*, 552 F.3d 216, 217 (2d Cir. 2008) (*quoting Lujan*, 504 U.S. at 560).  Allegations of a future injury is sufficient to establish standing where "there is a '**substantial risk**' that the harm will occur." *Susan B. Anthony List*, 134 S. Ct. at 2341 (quoting *Clapper v. Amnesty International USA,* 133 S.Ct 1138, 1147, 1150 n. 5 (2013)) (emphasis added).

Plaintiff has sufficiently alleged a cognizable injury-in-fact. The Complaint alleges that the disparate treatment in the Exchange Offer caused harm to Plaintiff and other members of the proposed class, by causing the Company to incur increased interest expenses and rating downgrades, which negatively impacted the value of the Class Notes and affected the likelihood of full repayment of principal and interest. (¶¶ 31, 40, 63, 70.) Specifically, the Complaint alleges that Defendant's Exchange Offer resulted in a downgrade by Moody's (which Moody's

categorized as a "distressed exchange" and thus an "event of default"[4]). (¶ 40.) The Complaint also highlights that the issuance of the New Secured Notes, which bear an interest rate of 8% per annum, in connection with the Exchange Offer resulted in an additional $21 million per year in California Resources' interest expenses. (*Id.*) Those increased interest expenses weaken California Resources' ability to become cash flow positive and pay interest and principal on the Class Notes as they come due. (*Id*.) Further, as the Company conceded in its confidential Offering Memorandum, the Exchange Offer exposed Plaintiff and other non-QIB holders of the Class Notes to a litany of increased risks, that were not there before, including: (i) the subordination of the Class Notes to the New Secured Notes; (ii) illiquidity of the Class Notes; and (iii) adverse effects on the market price along with price volatility for the Class Notes. (¶ 31.) The subordination and change in the Company's financial complexion undoubtedly caused a decline in the value of the Class Notes, by a measure to be determined at trial.

Moreover, the Company's own statements about its tenuous financial position at the time of the Exchange Offer demonstrate a "concrete or imminent injury." (*See* Def. Br. at 2; ¶ 15.) Specifically, California Resources stated that it was "in the throes of rapidly deteriorating market conditions" which "put pressure on [it's] ability to generate positive cash flow." (¶ 15; Def. Br. at 2.) In the Offering Memorandum, California Resources emphasizes the fact that its "substantial indebtedness" poses a risk to the Company and holders of its outstanding debt. (¶ 31; *see also* ¶¶ 40 & 42.) Indeed, Defendant has all but conceded Plaintiff's standing in the Offering

---

[4] Moody's explains that it "include[s] distressed exchanges in [its] definition of default in order to capture credit events whereby ***issuers effectively fail to meet their debt service obligations but do not actually file for bankruptcy or miss an interest or principal payment.*** Moody's employs fundamental analysis in assessing the likelihood of future default and considers various indicators in assessing loss relative to the original promise, which may include the yield to maturity of the debt being exchanged." *See* Moody's Investors Service, *Rating Symbols and Definitions*, (July 2016), *available at* https://www.moodys.com/sites/products/AboutMoodysRatingsAttachments/MoodysRatingSymbolsandDefinitions.pdf. (emphasis added).

Memorandum, stating that "there continues to be ***substantial risk*** that [it] could be, among other things, unable to repay the [Class] Notes at maturity." ¶ 31 (emphasis added.); *see Susan B. Anthony List*, 134 S.Ct. at 2341 (allegations that there is a "substantial risk" that harm will occur is sufficient to establish standing). The Offering Memorandum further explained that "holders of the [Class] Notes who fail to validly tender their [Class] Notes and/or whose tendered [Class] Notes are not accepted for exchange by use [sic] may not be paid in full… [And] may recover less than [they] would have had [they] tendered such [Class] Notes for the New Secured Notes in the Exchange Offer." (¶ 31; *see also* ¶42 (*Bloomberg*: "You will be incentivized to offer as many of the bonds as you have in hopes you get as much of the new secured debt as you possibly can, because that's going to help mitigate your losses…. If you don't go along with it, you know you're going to take a hit. You might as well go along with it to minimize whatever that hit is going to ultimately be.").)

Courts in this District have repeatedly found such injuries to be sufficient for Article III standing. Particularly, in light of California Resources' precarious financial condition and the Exchange Offer, which created a "substantial risk" the Company would be unable to pay the principal when the Class Notes mature, no doubt diminished the value of the Class Notes, and resulted in a ratings downgrade, Plaintiff's allegations are sufficient for injury-in-fact standing. *See Royal Park Investments SA/NV v. HSBC Bank USA, Nat. Ass'n*, 109 F. Supp. 3d 587, 612 (S.D.N.Y. 2015) (finding Article III standing under the TIA where plaintiffs alleged diminution in value of their notes, and not "actual damages," noting "[t]he method for measuring recoverable damages will be determined at a later date, as is customary in securities actions"); *NECA-IBEW* 693 F.3d at 166; *see also Ret. Bd. of the Policemen's Annuity & Benefit Fund of City of Chicago v. Bank of Am., NA*, 907 F. Supp. 2d 536, 546 (S.D.N.Y. 2012) (finding Article III standing where

plaintiff alleged that "(a) a diminution in value of the certificates it purchased (b) as a result of defendants' purported breaches of the [governing contract] that is (c) redressable through this breach of contract action as well as under various provisions of the Trust Indenture Act." (citing *Lujan*, 504 U.S. at 560–61)).

In *NECA-IBEW*, the Second Circuit confirmed that the injuries alleged in the Complaint are sufficient, finding that the plaintiff pled a cognizable injury under the Securities Act of 1933 in connection with certain fixed-income securities. *NECA-IBEW* 693 F.3d at 166. Specifically, the Second Circuit found that the plaintiff's allegations that the challenged actions caused a ratings downgrade and exposed the security-holders to greater risk "plausibly pled a cognizable injury— a decline in value[.]" *Id*. The Court reasoned that "it is not just plausible—but obvious—that [fixed-income] securities like the Certificates would suffer a decline in value as a result of (1) ratings downgrades and (2) less certain future cash flows." *Id*. While defendants in *NECA-IBEW* argued, like Defendant does here, "that plaintiff suffered no loss because the Complaint did not allege any missed payment from the Trusts and the Fund admitted that no payments had been missed[,]" the Court correctly noted that "basic securities valuation principles—discounting future cash flows to their present value using a rate of interest reflecting the cash flows' risk—belie the proposition that a fixed income investor must miss an interest payment before his securities can be said to have declined in 'value.'" *Id*. The Court in *NECA-IBEW* further explained that the value of a fixed-income security is affected "immediately" upon the revelation of previously undisclosed risks associated with the security's underlying assets. *Id* ("whether Certificate-holders actually missed a scheduled coupon payment is not determinative." (citation omitted)).

Here, not only does Defendant assert that the Exchange Offer caused no plausible injury to Plaintiff and other members of the Class because they did not yet miss any payments, but that

"[t]he Exchange Offer ***actually improved*** CRC's financial condition by reducing its debt by $563 million and increasing its liquidity." (Def. Br. at 12 (emphasis added); *see also* Def. Br. at 14 ("A plaintiff cannot establish an injury-in-fact when it received an economic benefit from the transaction." (citing *In re AOL Time Warner Inc. Sec. & ERISA Litig*, 381 F. Supp. 2d 192, 246 (S.D.N.Y. 2004)), and 24 ("Plaintiff, and CRC's other noteholders, all benefited from the Exchange Offer because CRC enhanced its liquidity and substantially reduced its debt."). This counter-fact is plainly incorrect. First, as noted by Moody's, and alleged in the Complaint, although the Exchange Offer "reduced the principal amount of outstanding notes by $563 million, [] the increase in interest expense weakens the company's interest coverage."[5] (¶40.) Second, "[i]t may well be that, ultimately, the [plaintiff] will recover nothing because defendants will prove that any diminution in value is attributable to, *e.g.,* (1) illiquidity, (2) the global financial crisis, or (3) a widening of credit spreads rather than defendants' misrepresentations. But that is irrelevant to whether plaintiff has alleged, at the pleading stage, a cognizable injury under the statute." *NECA-IBEW,* 693 F.3d at 167 n.15.

Defendant's assertion that Plaintiff fails to allege an injury in fact is based upon its misplaced reliance on numerous inapposite cases. (*See* Def. Br. at 12.) As opposed to the cases relied upon by Defendant, where plaintiffs brought claims where they have yet to sustain actual damages, the effectuation of the Exchange Offer diminished the value of Class Notes and harmed Plaintiff "immediately." *NECA-IBEW,* 693 F.3d at 166. Distinguishable from the facts in *SC Note*

---

[5] Interest coverage "is a debt ratio and profitability ratio used to determine how easily a company can pay interest on outstanding debt…. In other words, it measures the margin of safety a company has for paying interest during a given period, which a company needs in order to survive future (and perhaps unforeseeable) financial hardship should it arise. A company's ability to meet its interest obligations is an aspect of a company's solvency, and is thus a very important factor in the return for shareholders." *See* Investopedia, Definition of "Interest Coverage Ratio," http://www.investopedia.com/terms/i/interestcoverageratio.asp#ixzz4HRi3iILT (last visited September 7, 2016).

where the risk of the trust's loss of preferred tax status was yet to be decided by the IRS, the value of the Class Notes have already been diminished as a result of the Exchange Offer.[6] *SC Note Acquisitions LLC v. Wells Fargo Bank*, N.A., 934 F.Supp.2d 516, 522 (E.D.N.Y. 2013). In *Rajamin*, the challenged actions – the defective assignment of the plaintiff's mortgage – had no impact on the plaintiff or the underlying asset of the mortgage. *Rajamin v. Deutsche Bank Nat'l Trust Co.*, 757 F.3d 79 (2d Cir. 2014) . Here, the challenged actions, the Exchange Offer, had an immediate effect on the value of the Class Notes. (*See* ¶ 40.) In *Ross* v. *AXA Equitable Life Insurance Company*, insurance policy-holders brought an action against the insurer alleging that they were injured as a result of various "shadow" insurance transactions, which they claimed resulted in them paying for insurance policies that were less secure than represented to them. 115 F. Supp. 3d 424, 437 (S.D.N.Y. 2015). Notably, the plaintiffs "d[id] not allege in the Complaint that [the insurer's] undisclosed or inadequately disclosed shadow insurance transactions caused them financial harm[.]" *Id.* at 430–31. In contrast, the Exchange Offer had an immediate negative impact on the value of the Class Notes themselves, not California Resources. *NECA-IBE,* 693 F.3d at 166.

## III. THE COMPLAINT SUFFCENTLY ALLEGES THAT PLAINTIFF'S CLASS NOTES WERE IMPAIRED AND/OR AFFECTED IN VIOLATION OF THE TIA & THE INDENTURE

### A. The TIA Provides For The Unequivocal Right For Holders To Be Free From Nonconsensual Actions That Affect Their Right To Principal And Interest

The TIA, like all federal securities law, was adopted to protect public investors from abuse. *BOKF,* 144 F. Supp. 3d at 465 (quoting *Bluebird Partners, L.P. v. First Fidelity Bank, N.A.*, 85 F.3d 970, 974 (2d Cir.1996) (parenthetical and citation omitted)). In particular, Congress included

---

[6] For the same reasons, *Scanlan v. Kodak Ret. Income Plan*, 678 F.Supp.2d 110, 114 (W.D.N.Y. 2010), is inapplicable.

Section 316(b) in the TIA in order to prevent the nonconsensual abuse of minority investors for the benefit of large investors that control the majority of any given security. 15 U.S.C. § 77ppp(b); *see Marblegate II,* 111 F. Supp. at 553 (quoting H.R. Rep. 76–1016, at 56 (1939); S.Rep. No. 76–248, at 26–27 (1939) (Section 316(b) was implemented to prevent the "[e]vasion of judicial scrutiny of the fairness of debt-readjustment plans" and to "place a check or control over the majority forcing on the minorities a debt-readjustment plan.") Section 316(b) provides, in pertinent part, that "***the right of any holder*** of any indenture security to receive payment of the principal of and interest… ***shall not be impaired or affected without the consent of such holder***[.]" *Id.* (emphasis added).

"[T]he starting point in any case of [statutory] interpretation must always be the language itself, giving effect to the plain meaning thereof." *MeehanCombs,* 80 F. Supp. 3d at 515 (quoting *Kuhne v. Cohen & Slamowitz, LLP*, 579 F.3d 189, 193 (2d Cir.2009)). Notably, Section 316(b) protects a noteholder's right to be free from nonconsensual actions that "impair" or "affect" their right to principal and interest. 15 U.S.C. § 77ppp(b). Nor does the statute proscribe a specific transaction that must occur prior to a noteholder asserting his rights under Section 316(b). Indeed, the plain meaning of "impair" and "affect" in Section 316(b) does not require that an issuer alter the payment terms or amend the governing indenture, as Defendant suggests. (*See* Def. Br. at 3, 17.) As noted by the Court in *Marblegate I*, demanding that a specific sort of transaction must occur in order to raise a claim under Section 316(b) would "allow[] a sufficiently clever issuer to gut the Act's protections through a transaction such as the one at issue here." *Marblegate Asset Mgmt. v. Educ. Mgmt. Corp.*, (*Marblegate I*) 75 F. Supp. 3d 592, 613 (S.D.N.Y. 2014). Accordingly, in line with the plain meaning of the statute, and contrary to Defendant's assertion that only recently in three "inapposite" cases (Def. Br. at 15-16) has Section 316(b) been extended

to cases not involving a legal impairment, this District has a unwavering and longstanding history over the last seventeen years of protecting a holder's legal *and practical right* to receive payments under an indenture. *See Federated,* 1999 WL 993648, at *7; *MeehanCombs*, 80 F. Supp. 3d at 516; *BOKF*, 2015 WL 5046785, at *4, *Marblegate II*, 111 F. Supp. 3d at 555.

### B. The Exchange Offer Affected And Impaired Plaintiff's Right To Receive Principal And Interest On The Class Notes

Plaintiff has alleged a proper claim under Section 316(b) of the TIA and a breach of the Indenture's Section 6.07.[7] Defendant seeks to have this Court disregard this District's well-established precedent in favor of a Delaware bankruptcy court decision and Kansas District Court decision. (Def. Br. at 15-17 (discussing *YRC Worldwide Inc.* v. *Deutsche Bank Trust Co. Americas*, 2010 WL 2680336 (D. Kan. July 1, 2010) and *In re Northwestern Corp.*, 313 B.R. 595 (Bankr. D. Del. 2004)).[8] Defendant's position is not novel, as defendants in *Marblegate I* also "offer[ed] three primary arguments as to why th[e] Court should side with *Northwestern Corp.* and *YRC Worldwide* rather than *Mechala*[,]" all of which the Court found "unsatisfying" and rejected. *Marblegate I*, 75 F. Supp. 3d at 612-13.

First, Defendant's argument that Plaintiff "has not suffered an impairment within the meaning of TIA § 316(b)[, because] Plaintiff does not allege any missed payments of principal or

---

[7] Section 6.07 of the Indenture is required by TIA Section 316(b) Plaintiff addresses both the statutory and contract claims simultaneously. *See Bluebird*, 85 F.3d at 974 ("the interpretation of the indenture provisions mandated by the [Trust Indenture] Act does not depend on ordinary contract principles—the intent of the parties—but depends on an interpretation of the statue").

[8] To the extent that Defendant asserts that *Ret. Bd. of the Policemen's Annuity & Ben. Fund of City of Chicago*, 914 F. Supp. 2d 422, supports its assertion that "Section 316(b), by its terms, protects only a noteholder's legal right to receive payment when due or to enforce payment obligations thereafter[,]" it is wholly inaccurate. (Def Brief at 16). At no point did the Court find that Section 316(b) solely protects a noteholder's legal right, to the exclusion of their practical right, to receive payments under the Indenture. *See id.* ("Plaintiffs do not respond to BNYM's arguments [that Section 316(b) applies only to a holder's *legal* rights]. Accordingly, the § 316(b) claim is deemed abandoned, and it is dismissed with prejudice." (citation omitted)).

interest," has already been addressed and rejected by Judge Scheindlin in *MeenhanCombs*. Judge

Scheindlin rejected this narrow interpretation, citing the holdings in *Federated*:

> CEC's narrow reading is not mandated by the statutory text; it is possible for a right to receive payment to be impaired prior to the time payment is due. Nor does CEC's narrow reading follow from the legislative history and purposes of the TIA. Although there is scant case law on point, I find the reasoning of two decisions from this District persuasive, particularly in light of the conduct alleged in the Complaint. Specifically, "the Court finds [ ] unsatisfying the notion that Section 316(b) protects only against formal, explicit modification of the legal right to receive payment, and allows a sufficiently clever issuer to gut the Act's protections through a transaction such as the one at issue here."

80 F. Supp. 3d 507, 515 (S.D.N.Y. 2015) (citations omitted).

Similarly, Defendant's claim that Plaintiff has not "alleged that default is imminent" and

that the Exchange Offer has strengthened the Company is incorrect. (Def. Br. at 4, 12-13.) As

noted above, the Complaint alleges that California Resources itself stressed the fact that it was "in

the throes of rapidly deteriorating market conditions" which "put pressure on [it's] ability to

generate positive cash flow[,] and that there was "substantial risk that [it] could be, among other

things, unable to repay the [Class] Notes at maturity." (Def. Br. at 2; ¶¶ 15, 18-19, 31.) Defendants

in the analogous, but out-of-District case *Oaktree Capital Mgmt., LLC v. Spectrasite Holdings,

Inc.*, No. CIV.A. 02-548 JJF, 2002 WL 32173072 (D. Del. June 25, 2002), made a strikingly

similar argument. In *Oaktree Capital*, plaintiffs challenged a tender offer which would result in

issuance of new debt that would subordinate plaintiffs' notes and transfer the issuers' assets to

another entity. *Id*. at *4. Defendants in that case argued that a challenged tender offer, much like

the Exchange Offer, "will strengthen the long-term prospects of the organization, ensuring that it

will be able to pay the notes in full when they mature in the future." *Id*; *c.f.* Def. Br. at 9, 14, 24.

The court, while not addressing the holders' practical rights under Section 316(b), found that that

plaintiffs had a reasonable probability of success on the merits of their claims that the tender offer violated Section 316(b) and its incorporated provision in the governing indenture. *Id.*

Second, Defendant's assertion that it did not engage in any form of corporate restructuring is misleading. (Def. Br. at 2.) The Exchange Offer was no mere "routine corporate transaction," but rather was a multi-billion dollar distressed action by a company "in the throes of rapidly deteriorating market conditions," attempting to restructure its self-described "substantial indebtedness." (Def. Br. at 5, 2; ¶ 31 (the Offering Memorandum); *see also supra* n.4 (Moody's categorized the Exchange Offer as a "distressed exchange," which means that the Company "effectively fail[ed] to meet their debt service obligations but d[id] not actually file for bankruptcy or miss an interest or principal payment.")). A debt restructuring may be "accomplished through an issuance of new bonds in exchange for a tender of … old bonds[,]" which is precisely what occurred in the Exchange Offer. *See e.g. EM Ltd. v. Republic of Argentina*, 131 F. App'x 745, 747 (2d Cir. 2005); *Eternity Glob. Master Fund Ltd. v. Morgan Guar. Trust Co. of New York*, No. 02 CIV.1312 (LMM), 2002 WL 31426310, at *4 (S.D.N.Y. Oct. 29, 2002) (holding that a "voluntary debt exchange" constituted a "restructuring"). Furthermore, the Exchange Offer was not a one-off transaction by California Resources, but was part of a series of restructuring initiatives by the Company, including amending certain financial covenants under its Revolving Credit Facility and Term Loan Facility. (¶ 21.)

Third, Defendant's argument that Plaintiff has not suffered an "impairment" because he did not allege "any right in the Indenture to participate in the Exchange Offer" elides the fact that California Resources was not permitted to circumvent the protections afforded to all holders of the Class Notes under Section 316(b).[9] Defendants in *Marblegate I* made a similar argument, that the

---

[9] Defendant's assertion that the Exchange Offer was merely the Company exercising its rights under the Indenture fails for the same reasons. (Def. Br. at 13.)

right to principal and interest under Section 316(b) "may be conditioned or limited by the Indenture itself[.]" *Marblegate I*, 75 F. Supp. 3d at 613. The Court held that defendants' argument simply "prove too much." *Id.* (reasoning that "if the Trust Indenture Act protects only those rights that are enshrined in an indenture…[then i]n effect, the statute would prohibit nothing more than violations of the indenture contract, rendering it superfluous."); *see also Oaktree Capital*, WL 32173072, at *4 (rejecting defendants' defense for an alleged violation of Section 316(b) that "Plaintiffs' rights are not impaired under the Trust Indenture Act merely because, consistent with the terms of the Indenture, Defendants will incur debt superior in rights to the previously issued notes under the Indentures.").

Finally, Defendant's attempt to distinguish the relevant cases (erroneously referring to them as a "departure from a long line of cases") in this District is equally unconvincing. (Def. Br. 18-21.) Defendant asserts that those cases are "easily distinguishable" from the Exchange Offer because the Company did not dispose of assets or eliminate guarantees from the Indenture. (Def. Br. at 5, 18-21.) As an initial matter, there is nothing in those cases that would require an issuer to remove guarantees in order for their reasoning to apply to the case at bar, where the Class Notes were affected without such removals. Additionally, Defendant's argument would preclude holders of unsecured notes from asserting their rights under Section 316(b), in accordance with *Federated* and its progeny, because the Class Notes were issued on an unsecured basis. Moreover, by granting the QIB holders of the Class Notes a security interest over all property and assets of the Company and its affiliated guarantors, Defendant did effectively dispose of assets away from Plaintiff. *See Dec. of Cafasso ISO MTD Ex. E*, S&P Global Ratings (Jan. 14, 2016) (S&P found that in the event of default, the Class Notes could expect 50% to 70% of their par value, compared to the 90% to

100% that the New Secured Notes could expect to receive).) Thus, the Exchange Offer is analogous to the challenged transaction in this District's precedent cases.

## IV.    THE INDENTURE'S NO-ACTION CLAUSE DOES NOT BAR PLAINTIFF'S STATE LAW CLAIMS

The "no-action" clause contained in the Indenture poses no bar to Plaintiff's state law claims for two reasons. First, the no-action clause does not apply to Plaintiff's claims because there was no "Event of Default," as defined by the Indenture. *See Howe*, 783 F. Supp. 2d 466. Second, the no-action clause does not apply to actions enforcing a Class Noteholder's right to payment. Section 6.06 of the Indenture provides:

> (a) No Holder of any of the Notes of any series has any right to pursue any remedy with respect to this Indenture unless (1) ***the Trustee shall have received written notice that an Event of Default has occurred and is continuing***, (2) the Trustee shall have received a written request from Holders of at least 25% in aggregate principal amount of the outstanding Notes of such series to pursue such remedy, (3) the Trustee shall have received indemnity from the Holders reasonably satisfactory to it against loss, liability or expense to pursue such remedy as Trustee under the Notes of such series and this Indenture, (4) the Trustee shall have failed to act for a period of 60 days after receipt of such written notice, request and such offer of security or indemnity, and (5) no direction inconsistent with such written request has been given to the Trustee during such 60-day period by the Holders of a majority in aggregate principal amount of the outstanding Notes of such series.

> (b) ***The limitations set forth in paragraph (a) of this Section 6.06 do not, however, apply to a suit instituted by a Holder of a Note of such series for the enforcement of the payment of the principal of, premium***, if any, or interest on such Note on or after the respective due dates expressed in such Note.

(Indenture, 6.06).

"[W]here a 'no action' provision applies by its terms to claims relating to an Event of Default, 'such clauses do not prevent noteholders from bringing extra-contractual tort claims or breach of contract claims that are not of the type to which the 'no action' provision, by its terms, applies.'" *Howe*, 783 F. Supp. 2d at 473–74 (citing *Metro. W. Asset Mgmt., LLC v. Magnus Funding, Ltd.*, No. 03 CIV. 5539 (NRB), 2004 WL 1444868, at *5 (S.D.N.Y. June 25, 2004)

18

(citing *Cruden v. Bank of New York,* 957 F.2d 961 (2d Cir.1992))). In *Howe* and *Metropolitan West*, the Courts analyzed no-action clauses that were "nearly identical" to each other, and to Section 6.06 at issue here. *Howe,* 783 F. Supp. 2d at 473 (the indenture provided that "... no Holder of any Note shall have any right to institute any Proceeding, judicial or otherwise, with respect to this Indenture, or for any other remedy hereunder, unless: (i) such Holder has previously given written notice to a Responsible Officer of the Indenture Trustee of a continuing Event of Default...."); *Metropolitan West*, at *4 ; *c.f.* Section 6.06 of the Indenture ("(a) No Holder of any of the Notes of any series has any right to pursue any remedy with respect to this Indenture unless (1) the Trustee shall have received written notice that an Event of Default has occurred and is continuing…").

Here, like in *Howe* and *Metropolitan West*, the no-action clause applies only where there has been an "Event of Default," as defined by the Indenture. Section 6.01(5) of the Indenture provides, in pertinent part, that "[a]n 'Event of Default' will occur with respect to each series of Notes if… there shall be a default in the performance, or breach of, any covenant or agreement of the Company or any Guarantor in this Indenture applicable to such series of Notes and, in each such case, failure to remedy such default within a period of 60 days ***after written notice thereof from the Trustee or Holders of 25% of the principal amount of such series of Notes***…" (Indenture, 6.01(5) (emphasis added).) Thus, an "Event of Default" may only occur *after* the Trustee or holders of 25% of the principal amount of the Class Notes have provided written notice of a breach of the Indenture to the Company. Defendant has brought forth no evidence that it received written notice of a breach of Section 6.07 of the Indenture, in connection with the Exchange Offer, and no basis exists to conclude that an "Event of Default" as defined in Section 6.01 of the Indenture has occurred. Notably, Plaintiff was neither the Trustee nor holder of 25%

of the principal amount of the Class Notes, and thus did not have the power to provide the requisite notice to trigger an "Event of Default."[10] Accordingly, since an "Event of Default" has not occurred, the no-action clause, by its own terms, does not preclude Plaintiff's claims.

Additionally, in another provision, the Indenture provides that the no-action clause shall not apply to noteholders' suits seeking to enforce their rights to receive payment of principal and interest. Section 6.07 of the Indenture states:

> ***Notwithstanding any other provision of this Indenture***, the right of any Holder of a Note to receive payment of principal, premium, if any, or interest on such Note, on or after the respective due dates expressed in such Note, or to bring suit for the enforcement of any such payment on or after such respective dates, shall not be impaired or affected without the consent of such Holder.

(Indenture, 6.07) (emphasis added). Likewise, Section 6.06 of the Indenture expressly provides that the no-action clause "do[es] not, however, apply to a suit instituted by a Holder of a Note of such series for the enforcement of the payment of the principal of, premium, if any, or interest…" (Indenture, 6.06(b).)

In the case at bar, Plaintiff has brought the precise claims excluded from the no-action clause—Plaintiff is merely enforcing his unconditional right to receive payment of principal and interest. Thus, according to the plain language of the Indenture, Plaintiff has an absolute right to bring a suit and his claims enforcing his right to principal and interest, pursuant to Section 6.07 of the Indenture, which is not barred by the no-action clause.

---

[10] To the extent that Defendant attempts to argue that the requirements of Sections 6.01 and 6.06 are inconsistent or ambiguous, such an argument would not assist its defense. "[W]here a contract contains an ambiguity or contradiction or apparently inconsistent provisions, the 'contra proferentem' principle requires that the contract be construed against the drafter." *Metro. W. Asset Mgmt., LLC v. Magnus Funding, Ltd.*, No. 03 CIV. 5539 (NRB), 2004 WL 1444868, at *5 (S.D.N.Y. June 25, 2004) (citations omitted).

## V.    THE COMPLAINT ADEQUATELY ALLEGES A CLAIM FOR BREACH OF CONTRACT

To state a breach of contract claim under New York law, a plaintiff must allege: (1) a valid contract; (2) plaintiff's performance; (3) defendant's failure to perform; and (4) damages resulting from the breach. *Landmark Ventures, Inc. v. Wave Sys. Corp.*, No. 12-3634, 2013 WL 909184, at *1 (2d Cir. Mar. 12, 2013); *Diesel Props S.r.l. v. Greystone Bus. Credit II LLC*, 631 F.3d 42, 52 (2d Cir. 2011). The Complaint adequately alleges each of these elements.

In fact, California Resources does not assert that the Complaint fails to properly plead these elements; instead it argues that the breach of contract claim should be dismissed as duplicative of the TIA claim. (*See* Def. Br. at 22-23.) Defendant's argument is unavailing and runs contrary to controlling case law. *See, e.g., MeehanCombs*, 80 F. Supp. 3d at 520 (upholding breach of contract claim and Section 316(b) claim).

## VI.    THE COMPLAINT ADEQUATELY ALLEGES A CLAIM FOR BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

"Under New York law, the implied covenant of good faith and fair dealing inheres in every contract." *MeehanCombs,* 80 F. Supp. 3d at 514 (quoting *Travelers Int'l, A.G. v. Trans World Airlines, Inc.*, 41 F.3d 1570, 1575 (2d Cir.1994). "Encompassed within the implied obligation of each promisor to exercise good faith are any promises which a reasonable person in the position of the promisee would be justified in understanding were included." *Dalton v. Educ. Testing Serv.*, 87 N.Y.2d 384, 389, 663 N.E.2d 289 (1995) (quotations and citations omitted); *Gaia House Mezz LLC v. State St. Bank & Trust Co.*, 720 F.3d 84, 93 (2d Cir. 2013) ("The doctrine is employed when necessary to…protect the [parties] reasonable expectations.").

While California Resources protests that Plaintiff "does not point to any Indenture provision barring differential treatment of bondholders in exchange offers or any provision of the Indenture entitling him to participate[,]" it fails itself to point to any provision which allows for

disparate treatment of holders of the Class Notes on the basis of net worth. Def. Br. at 24; *see Gaia House Mezz*, 720 F.3d at 93 (holding that the implied covenant of good faith and fair dealing is to be used only to imply an obligation that is consistent with the rest of the terms of the contract) (citation omitted). In fact, the Indenture includes, and the Complaint alleges, multiple provisions providing for the equal treatment of all holders of the Class Notes. (¶ 44.) For example, the Indenture demands equal treatment, on a pro rata basis when applicable, of all holders of the Class Notes when: (1) less than all of the Class Notes are to be redeemed, (Section 3.02); (2) the Company makes an offer to repurchase the Class Notes upon a change of control, (Section 4.09); or (3) the Company seeks an amendment or supplement to the Indenture or Class Notes, (Section 9.02). (¶ 44.) Thus, in light of the consistent and repeated provisions in the Indenture, it was reasonable for Plaintiff, and other non-QIB holders of the Class Notes, to expect that if California Resources exchanged the Class Notes for the New Secured Notes, they would be provided the same opportunity to participate, on a pro rata basis, as all other holders. *See Gaia House Mezz*, 720 F.3d at 93.[11] Accordingly, the Complaint sufficiently states a breach of the implied covenant of good faith and fair dealing.

## VII.    THE COMPLAINT ADEQUATELY ALLEGES A CLAIM FOR UNJUST ENRICHMENT

To state a claim for unjust enrichment under New York law, a plaintiff must allege that: "(1) defendant was enriched, (2) at plaintiff's expense, and (3) equity and good conscience militate against permitting defendant to retain what plaintiff is seeking to recover." *Briarpatch Ltd., L.P v. Phoenix Pictures, Inc.*, 373 F.3d 296, 306 (2d Cir. 2004)(citation omitted). Here, the Complaint alleges that as a result of the challenged Exchange Offer, California Resources was able to record

---

[11] Further, as a matter of equity, the Exchange Offer has effectively the same result as a selective, non-pro rata, partial redemption of the Class Notes. Precisely, what is prohibited by Section 3.02 of the Indenture.

a gain of approximately $560 million. (Complaint 22, 39, 81) The Complaint further alleges that as a direct and intentional result of the Exchange Offer, the Class Notes not tendered into the Exchange Offer were subject to, *inter alia*, a ratings downgrade, increase risk of default (due to, *inter alia*, weakened interest coverage), and were subordinated to the New Secured Notes, which reduced the value of the Class Notes and impaired Plaintiff's rights to receive interest and principal.[12]

## VIII.   THE COMPLAINT ADEQUATELY ALLEGES A CLAIM FOR DECLARATORY JUDGMENT

"In a case of actual controversy within its jurisdiction," a federal court "may declare the rights and other legal relations of any interested party seeking such a declaration…." 28 U.S.C. § 2201(a). When deciding whether to entertain an action for declaratory judgment, a court must ask: (1) whether the judgment will serve a useful purpose in clarifying or settling the legal issues involved; and (2) whether a judgment would finalize the controversy and offer relief from uncertainty. *Kramer v. Lockwood Pension Servs.,* 653 F. Supp. 2d 354, 375–76 (S.D.N.Y. 2009) (citation omitted). When deciding whether to dismiss an action for declaratory judgment the Second Circuit has instructed district courts to consider: "(1) whether the judgment will serve a useful purpose in clarifying or settling the legal issues involved; and (2) whether a judgment would finalize the controversy and offer relief from uncertainty." *Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co.*, 411 F.3d 384, 389 (2d Cir. 2005) (citation omitted).

Count Five (Declaratory Judgment) of the Complaint seeks a declaration, pursuant to 28 U.S.C. § 2201, in connection with the Exchange Offer and the New Secured Notes issued thereunder. (¶¶ 87-88.) The declaration sought in Count Five is necessary and appropriate to

---

[12] Additionally, Defendant's argument that Count Four is merely duplicative of Plaintiff's other counts fails because New York law permits an unjust enrichment claim to be pled in the alternative to breach of contract. *Goldman v. Simon Prop. Grp., Inc*., 58 A.D.3d 208, 220 (2d Dep't 2008).

establish that the Exchange Offer is ineffective and that the liens purportedly created in the Exchange Offer for the benefit of the New Secured Notes are null and void. *Id.* Plaintiff seeks a declaration of his, and other bondholders', rights under a contract (the Indenture), making this an "appropriate circumstance for declaratory judgment." *Penn. Mut. Life Ins. Co. v. Wolk*, 739 F. Supp. 2d 387, 394 (S.D.N.Y. 2010) (finding declaratory judgment claims proper, including declaration of rights under an insurance contract). Moreover, Plaintiff's claim for declaratory relief related to the validity of the liens securing the New Secured Notes is necessary to avoid further adjudication should California Resources enter into bankruptcy. (*See* ¶ 31.)

Defendant does not challenge that the Complaint adequately alleges an "actual controversy" exists in this action, but rather asserts that Count Five (Declaratory Judgment) is duplicative of Counts One (TIA violation) and Two (Breach of Contract) and should be dismissed because it "would serve no 'useful purpose' in the overall context of this litigation. (Def. Br. at 25 (quoting *Fleisher* v. *Phoenix Life Ins. Co.*, 858 F. Supp. 2d 290, 302 (S.D.N.Y. 2012).) Plaintiff's claims of breach of contract and declaratory relief claims are more closely analogous to those in *GSO Coastline Credit Partners LP v. Glob. A&T Elecs. Ltd.*, 139 A.D.3d 409, 411, 30 N.Y.S.3d 109, 111 (N.Y. App. Div. 2016), rather than the facts presented in *Fleisher*, the principal case relied upon by Defendant. In *GSO*, the court held that plaintiffs' claim for declaratory relief was to be reinstated where the complaint adequately alleged a cause of action for breach of the indenture. *Id.*

## CONCLUSION

For the foregoing reasons, the Court should deny Defendant's motion to dismiss in its entirety.[13]

Dated: September 7, 2016

Respectfully submitted,

**LEVI & KORSINSKY LLP**

By: _/s/ Eduard Korsinsky_          .
Eduard Korsinsky
30 Broad Street, 24th Floor
New York, NY 10004
Tel: (212) 363-7500
Fax: (212) 363-7171

_Attorney for Plaintiff_

---

[13] If the Court determines that Plaintiff has not properly pled any or all of his claims, Plaintiff respectfully requests the right to replead such claims. _See_ Fed. R. Civ. P. 15(a)(2) (leave to amend is "freely granted").